**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Donald Lee FEREBE, Defendant–**
**Appellant.**

**No. 01–22.**

United States Court of Appeals,
Fourth Circuit.

Argued: Sept. 26, 2002.

Decided: June 18, 2003.

**ARGUED:** Michael Schatzow, VENA-BLE, BAETJER & HOWARD, L.L.P., Baltimore, Maryland, for Appellant. James G. Warwick, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Charles G. Bernstein, BERNSTEIN & SAKELLARIS, Baltimore, Maryland, for Appellant. Thomas M. DiBiagio, United States Attorney, Baltimore, Maryland, for Appellee.

Before NIEMEYER, LUTTIG, and MICHAEL, Circuit Judges.

Vacated and remanded by published opinion. Judge LUTTIG wrote the opinion, in which Judge MICHAEL joined. Judge NIEMEYER wrote a dissenting opinion.

## OPINION

LUTTIG, Circuit Judge:

Appellant Ferebe challenges the district court's denial of his motion to strike and to bar the United States' Notice of Intention to Seek the Death Penalty (the "Death Notice") in his trial for the murders of Yolanda Evans and Benjamin Harvey Page, on the grounds that notice was not provided to him a reasonable time before the trial as required by Title 18, section 3593(a) of the United States Code. Ferebe concedes that the district court's order denying his motion to strike the Death Notice is not a final judgment, and thus is susceptible to our review only if it is a collateral order, subject to review under the standards articulated in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See Under Seal v. Under Seal*, 326 F.3d 479 (4th Cir.2003) (discussing the collateral order doctrine and its application in the Supreme Court and in the Fourth Circuit). The government contends that the district court's order was not a collateral order, but that if it was, the Death Notice was provided to Ferebe a reasonable time before trial, because he was not prejudiced by any tardiness in the filing of the Notice.

This case, having been fully briefed in December 2001, has now been presented to, and considered by, two separate panels of our court. Decision of the matter has been made difficult, both for the first panel that heard this case and for our panel, because the issues presented by the appeal—one jurisdictional, one relating to the governing analytical framework, and one involving application of that framework to the facts of the case—are tightly, if not inextricably, interwoven. This interweave, coupled with the diverging opinions of members of our court as to each issue, made attainment of dispositive agreement especially tricky. Today, however, we reach dispositive agreement on the required statutory analysis, and on its implications for the jurisdictional question.

We conclude that the proper analysis that is to be applied in deciding challenges to the timeliness of a filing under the Death Notice statute, 18 U.S.C. § 3593(a), is that of a pre-trial inquiry into the objective reasonableness of that timing. Because of the characteristics of orders decided under this analytical framework, we conclude that district court orders denying motions to strike Death Notices are collateral orders susceptible to our review. We are unable conclusively to determine the merits of this case, however, because the district court, operating under a different, and incorrect, analytical framework, did not make certain findings critical to the merits determination with sufficient clarity that we may rely on them in this case of life and death. Consequently, we vacate the appealed order and remand the case for further proceedings in the trial court.

## I.

Ferebe was first indicted on federal drug, gun, and murder charges, along with a co-defendant, in September 1997.[1] The murder charges stemmed from the shooting deaths of Yolanda Evans and Benjamin Harvey Page. Presumably because of the heinousness of the act, the prosecution sought authorization from the United States Attorney General to seek the death penalty for the charged murders. The

---

1. More precisely, Ferebe and his co-defendant were indicted under four provisions of Title 18 of the United States Code: section 924(j)(1) (firearms murder during or in relation to drug trafficking crime); section 924(c) (use and carrying of firearms during and in relation to drug trafficking crime); section 841(a) (conspiracy to distribute cocaine and marijuana); and section 2 (aiding and abetting).

Attorney General, in May 1998, authorized the death penalty for one of the two murders, and only against Ferebe. Because Ferebe alone was eligible for the death penalty, the district court severed Ferebe's trial from that of his co-defendant.

Ferebe's co-defendant proceeded to trial, was convicted in October 1998, and was sentenced to life imprisonment in 1999. Ferebe's trial, however, was continued because Ferebe, already serving a life sentence for a conviction in a related case, preferred to wait until his appeal in that case was final before proceeding in this case. In September 1999, this court affirmed Ferebe's conviction and sentence in that case, and certiorari was denied by the Supreme Court in early 2000. Around June 2000, the prosecution proposed that Ferebe plead guilty to the charges in this case and, in exchange, receive concurrent life sentences. Ferebe refused the offer in October 2000.

At a December 2000 hearing, the court scheduled Ferebe's case for trial in September 2001, and concurrently, the prosecution formally withdrew its outstanding and unaccepted plea offer. Upon the district court's scheduling of the trial at that December 15, 2000 hearing, nine months remained prior to the start of Ferebe's trial. At that point, the prosecution had not filed a Death Notice to inform Ferebe and the court formally that it intended to seek the death penalty at Ferebe's trial, as authorized by the Attorney General.[2]

Ferebe presents some evidence, and the prosecution does not challenge it, that, nation-wide, federal prosecutors file Death Notices, upon authorization by the Attorney General, with an average of 8.4 months remaining before trial. *See* J.A. at 82. Such filings are necessitated and gov-

erned by section 3593(a), which provides that:

> If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under the chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice[.]

18 U.S.C. § 3593(a).

On May 28, 2001, with the trial set to begin in five months time, the prosecution asked the Attorney General to reconsider the decision not to authorize the death penalty on Ferebe's second murder charge. Before the Attorney General responded, Ferebe's attorney contacted the prosecution on or about June 15, 2001, and informed it that Ferebe wished to enter a guilty plea, in exchange for concurrent life sentences. The prosecution agreed to the terms and entered into an agreement with Ferebe on June 19. The plea agreement, however, was conditioned on approval by the Attorney General, as just a few weeks earlier (June 7) a new Department of Justice ("DOJ") policy took effect, requiring prosecutors to obtain the Attorney General's consent prior to consummating plea agreements with death-eligible defendants.

As a consequence of the parties' conditional plea agreement, the parties and the district court agreed to postpone several scheduled June and July hearings and conferences. These hearings and conferences had been calendared in order for the parties and the court jointly to prepare trial materials such as the jury questionnaires and to address various pre-trial issues that

---

2. At this point in the chronology, Ferebe's indictment was more than four years old and the Attorney General's authorization of the

death penalty was more than three and a half years old.

needed to be settled prior to the start of trial on September 10.

On July 6, 2001, two months before Ferebe's trial was set to begin, the Attorney General authorized the death penalty against Ferebe for the second murder, as well as the first (which of course had been authorized in 1998). Twenty days passed after authorization of the death penalty prosecution as to the second murder before the Attorney General responded to the request for approval of the conditional plea agreement. On July 26, now just a month and a half before Ferebe's capital trial was set to commence, the Assistant Attorney General in charge of DOJ's Criminal Division informed the prosecution that the plea agreement was unacceptable.

The district court, the prosecution, and the defense attorney met for a conference on July 31, 2001, just over a month before the scheduled start of Ferebe's trial, to discuss the case and the ramifications of DOJ's rejection of the conditional plea agreement. At that meeting, defense counsel responded to the plea agreement's recision by announcing that Ferebe would still plead guilty to the charges in the absence of a plea agreement (because no Death Notice had yet been filed, Ferebe faced a maximum life sentence).

The next day, August 1, 2001, the prosecution filed a Death Notice for both of the murders with which Ferebe was charged. In light of the government's filing, Ferebe did not, as he announced he would like to do on the prior day, plead guilty. Instead, Ferebe filed a motion to strike and bar the Death Notice as being untimely filed under section 3593(a)'s requirement that such notices be filed a reasonable time before trial. Pursuant to Ferebe's motion, the district court set a briefing schedule. The court, on September 7, 2001, held a hearing on the matter, and on September 12 issued an oral opinion denying the motion.

It is that order to which this current appeal is directed.

## II.

■ As to the threshold jurisdictional issue, we now hold that district court orders denying motions to strike Death Notices as untimely filed are immediately appealable under *Cohen* and *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (Burger, C.J.), as they fully satisfy the three requirements for interlocutory appeal set forth by the Supreme Court. *See Under Seal*, 326 F.3d at 483. In *Abney*, the Supreme Court explained that a "final decision," as referenced in 28 U.S.C. § 1291, is distinct from a "final judgment," and "[is] to be given a practical rather than a technical construction," *Abney*, 431 U.S. at 658, 97 S.Ct. 2034 (citing *Cohen*). An order is sufficiently collateral to permit interlocutory appeal if it fully disposes of the issue it addresses, rather than leaves the issue "open, unfinished, or inconclusive," *Abney*, 431 U.S. at 658, 97 S.Ct. 2034; "resolves an issue completely collateral to the cause of action asserted," as opposed to being simply "a step toward final disposition of the merits of the case," *id.*; and "involves an important right which would be lost, probably irreparably, if review ... await[s] final judgment." *Id.*

Itself unwilling to advance the position accepted by the dissent, the government does not even argue that the district court's order denying the motion to strike the Death Notice and setting Ferebe's capital case for trial is inconclusive or that it is intertwined with the underlying merits of the prosecution. *Compare post* at 750–751 (Niemeyer, J.) (maintaining that the district court's order is both inconclusive and intertwined with the merits). The government's tacit concession that these two prongs of the collateral order inquiry

are satisfied is understandable. There is no question but that the district court's order fully disposes of the issue to which it is directed. It denied once and for all the motion to strike and scheduled Ferebe's case for trial, the very event that Ferebe claims entitlement to avoid, absent a reasonable time for preparation between the time of notice and commencement of trial. *See Abney*, 431 U.S. at 659, 97 S.Ct. 2034 (finding order denying double jeopardy defense to be conclusive because "no further steps [ ] can be taken in the district court to avoid the trial the defendant maintains is barred by the Fifth Amendment's guarantee").

The dissent believes differently, that, until "after [the] trial has occurred," *post* at 751, the district court's order "is merely speculative," because the pendency of trial necessarily "leaves open the question of the potential prejudice to Ferebe of trying a death penalty case with inadequate preparation time," *post* at 751. It believes that the reasonableness of the timing of the Death Notice depends entirely upon "the preparation denied or adversely affected [*i.e.*, prejudice] by a notice allegedly given late. And ultimately the adverse effect of preparation [*i.e.*, again, prejudice] can only be measured by the defense that the defendant *presented at trial.*" *Id.* at 748 (emphasis added).

The flaw in this analysis is an underlying misunderstanding of section 3593(a) and the right created thereby. The right requires, *as a prophylactic*, reasonable notice *before trial.* And its indisputable purpose is to ensure that the accused will not be required to stand trial for his life without having received adequate notice before that trial that he *is* to stand trial for capital offense (in addition to ensuring that an accused will not receive the death penalty without having received such notice). That Congress intended to protect the ac-

cused from having to endure a capital trial for which he was provided inadequate notice to prepare his defense is plain from the fact that it required the Death Notice be given a "reasonable time" before the trial, not merely "before" trial.

As a prophylactic statute, one of the chief aims of which is to protect the accused from having to endure a trial for his life for which he was not on reasonable notice, the statute must be interpreted to require an inquiry into the objective reasonableness of the time between issuance of the Death Notice and the trial itself, in light of the particulars of the charged offense and the anticipated nature of the defense.

Section 3593(a) thus understood, it is evident that an analysis of the finality of the denial of a motion to strike a Death Notice under that section that turns wholly upon a *post-trial* assessment of *prejudice* to the accused, as does the dissent's, *see post* at 748 ("the adverse effect of preparation [*i.e.*, prejudice] can only be measured by the defense that the defendant presented at trial"), cannot possibly be correct. For such an analysis substitutes for the statutorily-mandated inquiry into the pretrial, objective reasonableness of the time between issuance of the Death Notice and trial, a quite different, post-trial inquiry into the prejudice suffered by the accused as a result of the timing of the Death Notice—in effect a "harmless error" inquiry. This is to transform what was intended as a prophylactic statute into a mere remedial one, and to deny to the accused the right afforded by the statute, not merely to avoid sufferance of the punishment of death without adequate notice, but to avoid sufferance of trial for capital offense except upon adequate notice. To assure, as the dissent does, that review may be had at a later time (even post-trial) through a renewal of the motion to strike,

*see post* at 751, is to provide no assurance whatsoever, because the right guaranteed to the accused by section 3593(a) not to stand trial for capital offense except upon adequate notice, like the right not to be tried twice for the same offense, is denied if it is recognized only *after* the trial that the accused is assured by section 3593(a) he will not be required to endure.

The district court's order denying Ferebe's motion to strike the Death Notice equally indisputably resolves an issue collateral to the merits of the prosecution. The question of whether Ferebe received the statutorily-required reasonable notice is entirely separate from the question of his guilt for the murders committed, and its resolution will neither affect nor be affected by resolution of this latter question. *See Abney,* 431 U.S. at 659–60, 97 S.Ct. 2034 (deciding that order denying double jeopardy defense is collateral because it is "separable from the principal issue at the accused's impending criminal trial," "the [motion of the] defendant makes no challenge whatsoever to the merits of the charge," and *"[t]he elements of that claim are completely independent of his guilt or innocence "*(emphasis added)).

The dissent comes to the opposite conclusion on this score, as well. But, again, its error is attributable to its errant interpretation of section 3593(a). If one believes, as the dissent does, that section 3593(a) is neither prophylactic in character nor protective of a right not to stand trial except upon adequate notice, and therefore that the timeliness of the Death Notice must be gauged by a post-trial prejudice standard, then its conclusion that the questions of the timeliness of the Death Notice and of the merits of the prosecution are intertwined follows ineluctably. *See post* at 748 (concluding that "a 'reasonable' time must focus on the preparation denied or adversely affected [*i.e.,* prejudice] by a notice allegedly given late" and that "the adverse effect of preparation [*i.e.,* prejudice] can only be measured by the defense the defendant presented at trial").

On the dissent's understanding of section 3593(a), the syllogism that captures the proper analysis of the order's collateral nature is this: Section 3593(a) does not create an indefeasible right not to stand trial for capital offense except upon reasonable notice. Instead, the statute only ensures that an accused who is convicted and sentenced to death will be afforded a new trial if his conviction and death sentence were the result of an insufficient amount of time within which to prepare for trial. Therefore, whether notice was timely is exclusively a question of whether the conviction and sentence were attributable to an insufficient amount of preparation time, *i.e.,* whether actual prejudice was suffered because too little time remained between notice and trial to prepare the death penalty defense. Prejudice, being determined in large part, if not in full, by evaluating whether the accused would have been convicted and sentenced to death absent the alleged error, the questions whether the notice was timely filed and whether the evidence clearly established his guilt are necessarily and inextricably bound up together.

But, of course, the statute is *both* prophylactic *and* protective of the right not to be put to trial for capital offense except upon adequate notice. As such, the timeliness of the provided notice, which must be determined pre-trial and objectively, is unquestionably collateral to the question of guilt.

The third and final inquiry under *Abney* is whether the right allegedly at stake will likely be lost irreparably if immediate review is denied. It is on this prong that the government does pitch its argument, con-

tending that "Ferebe cannot show *irrevocable* harm." Appellant's Br. at 9–10; *see also id.* (arguing further that "no rights would be irrevocably lost if he awaits final judgment"). But as to this argument, the government (and the dissent, which accepts the argument) are also wrong, and because of the same misunderstanding of section 3593(a).

The focus in this third prong is not on whether a court *can* later adjudicate the claim asserted, as the dissent ultimately appears to believe, *compare post* at 745 ("[T]he order must be *effectively unreviewable* on appeal from final judgment." (emphasis added)), *with post* at 752 ("Ferebe retains the full rights to review and remedy such a violation at the end of the case"). Rather, the focus is on whether the assurances underlying the asserted right will be reneged upon if review is delayed until after trial. *See, e.g., Abney,* 431 U.S. at 661, 97 S.Ct. 2034 (concluding that this prong was satisfied because rights conferred on the defendant by the Double Jeopardy Clause would be "significantly undermined if appellate review were postponed" since the defendant would lose the assurance of the right that he would not be forced to "endure the personal strain, public embarrassment, and expense of a criminal trial"). Because one of the rights guaranteed by section 3593(a) is that not to be forced to stand trial for one's life without having received adequate notice of such, it follows, as in *Abney* with respect to a claim under the Double Jeopardy Clause, that delay in the review of a claimed denial of this right until after the trial itself has taken place is tantamount to countenance of the denial of the right.

On this prong of the analysis, the dissent tilts the playing field, as it were, by moving subtly from the properly framed inquiry—whether the order "remains *effectively* reviewable upon final judgment,"

*post* at 752—to an entirely different inquiry, namely, whether the order is *in fact* reviewable post trial, that is, whether, to quote the dissent, Ferebe "retains the full *rights to review and remedy* [the alleged] violation at the end of the case," *id.* at 752 (emphasis added). Says the dissent, "[a]ssuming conviction ... *improper notice* [can be] vindicated through a new trial." *Id.* at 753 (emphasis added).

But, as explained above, and as is plain from *Abney* and our decision in *United States v. Smith,* 851 F.2d 706 (4th Cir. 1988) (holding that district court order setting juvenile for trial as an adult constituted an appealable collateral order), the focus of *Abney*'s third prong is not on whether the question may be reviewed post-trial [i.e., whether Ferebe has a *right to post trial review*], it always *can* be. Rather, the focus is on whether the *underlying* right will be lost if review is postponed until after trial [*i.e.,* has Ferebe lost his *section 3593a right,* not his right to post-trial review of that underlying right]. Thus the proper question: whether the order is *"effectively* unreviewable," not whether it is *in fact* unreviewable, as the dissent's conclusion suggests.

Of course, one can only decide whether the underlying right is essentially lost, *i.e.,* whether the order is "effectively unreviewable," if review is delayed, if one knows what right is protected by the statute. *The dissent, tellingly, founds its understanding of the right that is protected by section 3593(a) on a self-contradictory formulation.* On the one hand, the dissent states that the section 3593(a) right "is a procedural *guarantee* that [defendants] will be given adequate time to prepare for a death penalty trial and sentencing." *Post* at 37 (emphasis added). On the other hand it states that that guarantee is not a right not to stand trial without that adequate time to prepare for a death penalty

trial. *See post* at 747, 748. Having admitted that the section 3593(a) right "guarantees" defendants that they will be given adequate time to prepare for a death penalty trial, the dissent's subsequent conclusion that the right gives defendants no right not to stand trial without such preparation time is analytically incomprehensible. *See infra* pp. 731–732 (explaining this subject at greater length).

Since section 3593(a), affirmatively described, creates for defendants not merely the right not to be convicted and sentenced without adequate time to prepare, but also the right not to stand trial for one's life absent the same, vacature of sentence and remand *after* trial and sentencing does not protect (nor, for that matter, even remedy the denial of) the right not to be forced to endure a capital trial except upon reasonable notice that one will be required to do so.

Because district court orders denying motions to strike Death Notices under section 3593(a)'s timeliness provision are conclusive, collateral to the merits, and if wrongly decided will irreparably deprive capital defendants of an important right, the appealed order is a reviewable collateral order, and we so hold.

### III.

■ Turning to the merits of the appeal, our interpretation of section 3593(a) reveals that the lower court erred by adopting the analytical framework that it did.[3] The district court's analytical approach (also the premise of the dissent's jurisdictional analysis)—relying on a prejudice inquiry to vindicate the right created by section 3593(a)—incorrectly substitutes a post-trial, harmless error inquiry for the inquiry into pre-trial, objective reasonableness mandated by the statute.[4] And thereby it fails to protect fully the right created by section 3593(a).

We, however, cannot proceed to dispose of Ferebe's claim under the proper analytical framework because the lower court, having adopted an incorrect analytical framework, did not clearly address certain necessary elements, without which findings a merits determination would not be appropriate. Consequently, we must vacate the district court's order and remand the case for further proceedings.

### A.

#### 1.

As discussed above, Title 18 Section 3593(a)'s plain language guarantees all who are accused of capital offense the right not to stand trial for their lives unless they have been provided notice a reasonable time before trial that in fact they are to stand trial for their lives.

If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that

---

3. The district court, in deciding to deny Ferebe's motion to strike the Death Notice, adopted the reasoning of the district court for the District of Puerto Rico, which, like the dissent here, concluded that challenges to Death Notices brought under section 3593(a)'s timeliness provisionought be evaluated under the analytical framework applied to Speedy Trial Act claims. *See United States v. Colon–Miranda,* 985 F.Supp. 31 (D.P.R. 1997) (Death Notice struck for being filed two weeks before trial, though a rescinded version was first filed three months before trial). Said the district court here, "the most important factor is prejudice to Mr. Ferebe." *See* J.A. at 211.

4. Though the lower court did not claim that its analysis necessitates a *post*-trial adjudication of motions to strike Death Notices, the logic of the lower court's prejudice-based analytical framework, as Judge Niemeyer well explains, unavoidably leads to such a result.

a sentence of death is justified under the chapter, *the attorney shall, a reasonable time before the trial* or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice—

18 U.S.C. § 3593(a) (emphasis added).

The district court, in its merits analysis, did not recognize this feature of the right created by section 3593(a). Nor does the dissent, despite its own conclusion that the section 3593(a) right "is a procedural *guarantee* that [defendants] will be given adequate time to prepare for a death penalty trial and sentencing." *Post* at 746 (emphasis added). But (and this is doubtless the reason for the tension between the dissent's description of the guarantee and its assertion that there is here no right not to stand trial absent the guaranteed preparation time), it is impossible to identify the right established under section 3593(a), which requires that notice be provided to a defendant *before* trial, without recognizing that the guarantee is that the defendant "will not be *tried* for his life without having received a lawful Death Notice." This statutorily-created right not to be tried for a capital sentence without having received reasonable notice can only be effectuated by an interpretation that the statute imposes a prophylactic requirement which, in turn, *necessitates* a pretrial inquiry into the objective reasonableness of the notice provided.

The dissent's contrary conclusion well illustrates why only an objective reasonableness analysis, undertaken pre-trial, adequately protects the right created by the statute. For the dissent's alternative post-trial prejudice analysis requires capital defendants to risk *permanent forfeiture* of the right that the statute guarantees them, by forcing them to wait until after trial to learn whether the trials they were required to endure were lawful.

In defending its post-trial, prejudice standard, the dissent, as described above, *supra* pp. 729–730, offers a wholly self-contradictory formulation of the section 3593(a) right, acknowledging that, on the one hand, section 3593(a) creates a guaranteed " *right* to ... a reasonable time to prepare for a death penalty trial and sentencing." *Post* at 748 n.1. In that vein, it describes the right as "function[ing] to inform" the defendant of the fact that his will be a capital trial and of the grounds for that proposed penalty, as "afford [ing] the defendant an opportunity to prepare his defense," and as "assur[ing] that the defendant and the court have notice of the penalty to be sought ... and of [the relevant] aggravating factors." *Post* at 746.

But, then, as if actually possessed of a different mind, the dissent asserts that though Ferebe has a *guaranteed right* that he "will be given adequate time to prepare for a death penalty trial and sentencing," that guarantee is not a right not to stand trial without that adequate time to prepare for a death penalty trial. *See post* at 748 ("Indeed ... the statute provides no assurance that a capital trial can be denied if the government fails to produce a timely notice [.]").

What the dissent gives with one hand— the "guarantee"—it takes back with the other—the denial of a right not to stand for capital trial in the absence of lawful notice. Were the dissent to set its "guarantee" in immediate relief to its conclusion that Ferebe has no right not to stand trial for his life in the absence of a lawful Death Notice, it simply could not avoid the conclusion that we reach: that section 3593(a) guarantees defendants that they will not be tried for their lives without lawful notice.

The analytical incomprehensibility of the dissent's contrary conclusion is not salvaged by its reliance on other procedural

rights, which it claims show that rights like the section 3593(a) right are not treated as rights not to stand trial. *See post* at 746, 747 n.1. *None of the rules to which the dissent points establish prerequisites for trial as, by the dissent's own admission, does section 3593(a).* Instead, those rules all simply govern admission of evidence and legal arguments at trial, which, by definition, are only violated when *at trial on the merits* such are unlawfully admitted. And of course, a flawed indictment, against which the dissent implies there is also no right not to stand trial, *see post* 748 n.1, is unappealable collaterally because orders denying challenges to indictments fail to qualify as collateral orders under *Abney,* not because of an absence of a right not to stand trial under a flawed indictment. A flawed indictment under *Abney* is unappealable collaterally for the simple reason that it is not "separable from the principal issue at the accused's impending criminal trial," *Abney,* 431 U.S. at 659–60, 97 S.Ct. 2034; it goes *directly* to the "merits of the charge." *Id.*

Because an accused is assured by section 3593(a) that, a reasonable time before trial, he will receive adequate notice that he is to be tried for capital offense, and consequently that he will not be required to stand trial for such offense absent that notice, his rights are denied at the point when he proceeds toward trial, or actually to trial, in the absence of a reasonable time between his receipt of the Death Notice and his capital trial. *And this is so, regardless of whether he will or will not be, or was or was not, prejudiced by an unreasonably delayed Death Notice.*

The dissent's interpretation—that if, after trial, it appears that the accused was not in any way prejudiced, then *a fortiori* he was provided reasonable notice—*necessarily* leads to the untenable conclusion that the statute would be satisfied if notice

were given after trial commenced or, for that matter, *never* given, provided the accused is not prejudiced thereby (for instance, because he proceeded throughout on the assumption that his was a capital trial).

This analytical point lies at the heart of the divide between our opinion and the dissent's. The dissent addresses this issue in footnote 3 on page —— of its opinion. There it reasons as follows:

> If notice is given after trial has commenced, the objection would be that notice was given after trial commenced, not a "reasonable time *before* trial." Likewise, if notice is never given, the objection would be that notice was never given.

*Post* at 750 n.3. This simply cannot be. For, as the dissent itself says, *because* "Congress [has] not mandate [d] a particular deadline for providing the notice," *post* at 746, "the *critical* determination under § 3593(a) is whether the notice was provided a reasonable time before trial," *post* at 746. Having thus explained the section 3593(a) right, *any objection* raised on the right, whether to late notice before trial, to late notice after trial begins, or to no notice at all, must establish that notice was not provided a *reasonable* time before trial.

And, under the dissent's analysis, the reasonable time that notice must be provided before trial could well be *never,* since the statute provides no "deadline" and prejudice is its sole concern. By way of the dissent's own contemplation: where a defendant "was able to prepare based on [actual, though not formal] notice," *post* at 749, that defendant would suffer no prejudice from lack of a Death Notice, the reasonable amount of notice time the defendant would need to prepare would thus be zero, and the statute would be satisfied.

Ultimately, the dissent's conclusion that the right turns on reasonableness, *see post* at 746, that reasonableness turns on prejudice, *see post* at 748, and that prejudice turns on the defendant's preparation at trial, *see id.*, cannot possibly be understood differently than to require a conclusion that the statute is satisfied in *every* instance in which there has been no prejudice. For if, as the dissent believes, adequate preparation time is the only concern of the statute and prejudice is the sole determinant of the adequacy of that preparation time, the statute is satisfied upon a finding that the defendant suffered no prejudice, regardless of when notice was given—and even if no notice were ever given.

That under the dissent's analysis a defendant who objects to the government's *complete* failure to provide him a Death Notice, but whose objection is overruled, must undergo trial for his life, conviction, being sentenced to die, and imprisonment on death row before he may appeal the district court's conclusion that the government's total failure to provide a Death Notice did not violate section 3593(a) only reinforces the conclusion that no notice could be lawful under the dissent's analysis and that the dissent's denial of this result is little more than *ipse dixit*.

And, were the dissent to suggest that its analysis does not require the conclusion that an order denying a challenge to a death penalty trial for which notice was *never* given is unappealable collaterally, it would then have to admit that the section 3593(a) right is a right not to stand trial, after all. To do so, however, would require either its forfeiting the entire analysis or relying upon the distinction that section 3593(a) *is* a right not to stand trial where notice is never given, but *is not* a right not to stand trial if the notice given is inadequate for the defendant to prepare

his defense. As perhaps the dissent senses, such a distinction—that no notice triggers a right not to stand trial, but that late notice does not trigger that same right—is wholly unconvincing. It fails analytically because both circumstances constitute the same violation—lack of lawful notice. But also it yields an instinctively unsatisfactory result. It would allow a defendant to bring a collateral appeal if a Death Notice were filed the moment after the judge gavelled the trial's *voir dire* to a start, but would not allow such an appeal if that same notice were filed but a moment before the gavel dropped.

That, in the end, these difficulties require the dissent to conclude that defendants who never receive notice that they are to be tried for their life must endure trial, conviction, death sentence, and death row imprisonment before they may appeal the denial of their objection to receiving no notice is but a symptom of the dissent's analytical error—its denial of the section 3593(a) right's full import.

The dissent's analysis also turns in on itself. The multiple factors the dissent goes to length to identify as serving to remedy violations of the statute confirm this. *See post* at 749. For, under the dissent's interpretation of section 3593(a), those many factors are actually meaningless. Since ultimately reasonableness is determined by reference to prejudice under the dissent's analytical framework, those assertedly distinct factors only have relevance insofar as they reveal prejudice.

We cannot embrace an interpretation of section 3593(a) that not only requires a post-trial assessment of prejudice but forbids a pre-trial assessment of the reasonable timeliness of the mandated Death Notice, without at the same time denying to those capital defendants who were provided no Death Notice or a Death Notice an unreasonably short time before their trials,

the right that is conferred upon them by section 3593(a). Accordingly, we must, and do, adopt the objective assessment of pre-trial reasonableness described fully above.

### 2.

That a post-trial, actual prejudice standard does not protect the rights created by section 3593(a) is sufficient reason to reject it. But the reasons assumed by the lower court and explained by the dissent in support of such a standard, themselves, also confirm the need for rejection of such a standard.

Both the lower court and the dissent superficially analogize the right created under section 3593(a) to the speedy trial right, and because a post-trial assessment of prejudice is the governing standard in the latter context, they conclude that the same standard should apply under section 3593(a). Upon careful consideration, however, it is plain that this analogy to the speedy trial right does not hold.

To begin with, even a quick comparison of the speedy trial right and the section 3593(a) right reveals that the two are not at all similar in the manners the dissent concludes. The Supreme Court provided a detailed explication of the speedy trial right in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). There the Court noted that the speedy trial right is unique in that it belongs to *both* the defendant *and* society.

> The right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused. *In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial, which exists separate from, and at times*

*in opposition to, the interests of the accused.*

*Id.* at 519, 92 S.Ct. 2182. *See also id.* at 519–21, 92 S.Ct. 2182 (noting that several explicit factors create society's interest in speedy trials, such as the backlog of cases in the courts which, among other things, enables defendants to achieve more attractive plea bargains; the fact that lengthy bond releases allow criminal suspects to commit further crimes; the temptation a lengthy bond release gives to a suspect to jump bond; the detrimental effect delays between trial and arrest have on preservation of evidence and the conduct of fair trials; the detrimental effect a delay in punishment may have on rehabilitation; the deplorable jail conditions that result from overcrowding worsened by those who cannot make bond; the high cost of lengthy pre-trial detention; and the lost wages of pre-trial detainees).

The Court further observed in *Barker* that violation of the speedy trial right "might work to the accused's advantage," *id.* at 521, 92 S.Ct. 2182, since it belongs to both the defendant and society. It also noted that the right is "a more vague concept than other procedural rights ... [since] [it] cannot definitely [be said] how long is too long in a system where justice is supposed to be swift but deliberate." *Id.*

The section 3593(a) right differs from the speedy trial right in every one of these respects. Unlike the speedy trial safeguards, section 3593(a) does not protect any societal interest of the kind referenced by the Court in *Barker.* To the contrary, this right to notice, like "the other rights enshrined in the Constitution for the protection of the accused," *id.,* provides a guarantee only to the criminal defendant. Relatedly, it is not even arguable that the enforcement of this right might work to Ferebe's advantage if the government

tries him for his life without providing a lawful Death Notice. Nor is it arguable that the section 3593(a) right suffers from the vagueness problem that inheres in rights that simultaneously protect multiple opposing interests.

These differences in characteristics are of no small moment, because *it was on the basis of these characteristics that the Supreme Court held that a post-trial prejudice analysis must be applied to speedy trial right claims. See Barker,* 407 U.S. at 530, 92 S.Ct. 2182 (reasoning that a balancing test is necessary for proper vindication of the speedy trial right because the right belongs to both the defendant and the society, because violations of the right can benefit the defendant, and because the right is vague by virtue of its belonging to both; and further reasoning that a prejudice inquiry is a necessary part of that balancing test).

Equally unfounded is the dissent's reliance on *United States v. MacDonald,* 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978), which, still by way of analogy to the speedy trial right, it maintains also dictates use of a post-trial prejudice standard to evaluate claims under section 3593(a). *MacDonald*'s principal holding was that speedy trial claims can only be evaluated post-trial, and so are not collaterally appealable. The Court based this holding on the fact that *Barker* governed such claims, and that *Barker* required a prejudice determination. The Court straightforwardly reasoned that since prejudice could not be determined until post-trial, pre-trial speedy trial claims were speculative, inconclusive, and tied to the merits, and thus were undeserving of *Cohen* collateral appealability. Insofar as *MacDonald* simply relied upon *Barker*'s prejudice analysis governing the professedly-unique speedy trial right, *MacDonald* is as inapplicable as is *Barker* itself.

Not only is *MacDonald*'s central analysis as inapplicable here as *Barker*'s for the reasons stated, but *MacDonald*'s alternative rationale for decision points up a further difference between the speedy trial right and the section 3593(a) right. *MacDonald* concluded that speedy trial right claims are not collaterally appealable also because the speedy trial right is *not* a right not to stand trial, thus making post-trial adjudication sufficient for vindication of the right.

> Unlike the protection afforded by the Double Jeopardy Clause, the Speedy Trial Clause does not, either on its face or according to the decisions of this Court, encompass a "right not to be tried".... *It is the delay before trial, not the trial itself, that offends.* ... If the factors outlined in *Barker v. Wingo,* combine to deprive an accused of his rights to a speedy trial, that loss, by definition, occurs before trial. Proceeding with the trial does not cause or compound the deprivation already suffered.

*MacDonald,* 435 U.S. at 861, 98 S.Ct. 1547 (emphasis added). In contrast, section 3593(a), provides defendants a right not to be tried without valid notice. *See supra* Part II.A.1. And proceeding with the trial most certainly compounds the deprivation.

Finally, the dissent justifies application of a post-trial, prejudice inquiry under section 3593(a) on the ground that the statute might appear to necessitate knowledge of the actual date that trial commences. *See, e.g., post* at 740–741, 749–750. But even if one were required to know the date that trial actually starts, it does not follow that a *post*-trial inquiry is mandated, much less the post-trial *prejudice* inquiry that the dissent would adopt. That the trial commencement date would have to be known (if that is the case) would require *at most* that the adjudication of the timeliness of a

contested Death Notice not occur until the instant the trial actually starts.

### 3.

Insofar as different, but analogous, rights and their required analyses are instructive, the section 3593(a) right closely resembles the constitutional right not to be tried twice for the same offence, as our discussion of *MacDonald* confirms. Violations of the latter the Supreme Court has of course never analyzed under a prejudice framework.

Additionally, there is also a powerful analogy between charging instruments (*i.e.*, indictments) and Death Notices. Both protect the fundamental fairness of proceedings at which criminal defendants are called upon to defend themselves. Both serve to set defendants on notice so that they can adequately prepare to defend themselves. Defendants have a right to receive both prior to trial. And violation by the government of those rights, if properly objected to, will invalidate the attendant proceedings. As with Double Jeopardy rights, the Supreme Court has never suggested that where a defendant objects to the unlawfulness of a charging instrument the lawfulness of the charging instrument should be evaluated under a prejudice framework.[5]

### 4.

In the final analysis, what must be borne in mind is that the interpretation of 18 U.S.C. § 3593(a) turns not at all on the implications of that interpretation for the separate question of appealability under 28 U.S.C. § 1291, even though the appealability under section 1291 turns dramatically on the interpretation of section 3593(a). It is the complete independence of the interpretive question from the appealability question that the dissent fails to appreciate.

If one understands that these are and must be separate and independent inquiries, then it is clear that whether there is prejudice cannot possibly be determinative of whether the right protected by section 3593(a) was violated. Prejudice in the sense intended by one who would assert that such *is* determinative of whether a statute has been violated (like the dissent), is akin to harmless error. And, of course, the harmlessness of an error is determined (and necessarily so) only *after* an antecedent conclusion that there was in fact an error committed. To inform resolution of the question of whether the statute has been violated by a prejudice inquiry is, pure and simple, to confuse the question of harmlessness with the question of violation.

Congress spoke quite clearly in section 3593(a): The government "shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a [Death Notice]." Because adoption of a post-trial, actual prejudice standard would not fully protect this right created under the statute; because there is no basis on which to analogize between the speedy trial right and this right; and because the Supreme Court has never sug-

---

**5.** Not only do the similarities between indictments and Death Notices confirm that prejudice should not be used to analyze violations of the latter, but their differences are consistent with our earlier conclusion that district court orders on Death Notice challenges are collaterally appealable. District court orders upholding challenged indictments are, of course, not collaterally appealable. This is so because indictments are necessarily bound up with the merits of the case. Death Notices, on the other hand, remain separate from the merits question of a defendant's guilt since their "charging" elements only pertain to sentencing.

gested use of a prejudice inquiry to vindicate those rights that are most analogous to the right found in section 3593(a), we conclude that there is no basis for applying a post-trial, prejudice standard when a violation of section 3593(a) is alleged.

## B.

■ Notwithstanding the dissent's fundamental disagreement with the court over the proper interpretation of section 3593(a), the first three factors it identifies as informing the inquiry into the reasonableness of the timing of the notice can, roughly, be legitimately encompassed within the objective inquiry that is mandated by the statute. *See post* at 748–749. To these, at least a fourth must be added. And consideration of still other factors is not foreclosed. To judge an accused's challenge to the reasonable timeliness of a Death Notice requires evaluation of, among other factors that may appear relevant, (1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects;[6] and, in addition, (4) the status of discovery in the proceedings. It should be determined on the basis of these factors whether sufficient time exists following notice and before trial for a defendant to prepare his death defense.

## C.

In this case, the district court analyzed Ferebe's section 3593(a) claims under a speedy trial act-type prejudice analysis. *See supra* note 3. This, as made clear by the above analysis, was error. We, however, cannot simply conduct the merits analysis ourselves to correct the error. For, as a consequence of the district court's adoption of the incorrect analytical framework, its decision did not sufficiently address necessary elements of the section 3593(a) analysis and thus did not produce certain findings indispensable to our review of the order. As a consequence, we must vacate the challenged order and remand the case to allow the district court to adjudicate the matter under the proper analytical framework.

### 1.

One of the essential elements that a proper analysis of a motion to strike a Death Notice for violation of section 3593(a)'s timeliness requirement must clearly address is the period of time that remains before trial, as of the moment of the Death Notice's filing, and irrespective of that filing. *See supra* p. 736 (the third of the four non-exclusive factors we set

---

**6.** To quantify this interval, a court naturally must have reference to *two* dates: the first, obviously, being the date the Death Notice is filed, and the second, obviously, being the trial date. Less obvious is that the scheduled trial date may constitute the trial date for purposes of analysis under section 3593(a) because of the prophylactic nature of the statutory right.

This latter conclusion is necessitated by the twin facts that the right guarded by section 3593(a) is violated *at the time* that a defendant is required to proceed to trial for his life with insufficient time to prepare, *see supra* pp. 731–732, and that, like all rights, with the

exception of the unique, speedy trial act right, *see supra* pp. 733–734, violation of the section 3593(a) right may be vindicated by objection at the moment of the violation. The only other possible analytical framework for vindicating the section 3593(a) right, one based on an after-the-fact review for prejudice, would allow notice *never* to be given and the notice requirement *still* to be satisfied. The statutory language simply does not countenance such a result. And so, we must prefer the pre-trial objective reasonableness analysis, which by its character, for purposes of pre-trial Death Notice challenges, references the set trial date as the date of trial.

out for determining the pre-trial objective reasonableness of the timing of a Death Notice). By logical necessity, of course, before a court can assess the objective reasonableness of this interval (*i.e.*, the interval between the Death Notice's filing and trial), it must first quantify the interval. *See supra* note 6. If *no* date of trial is identifiable, then the interval between the date of filing and that yet unknown and unidentified date cannot be measured. And if the interval cannot be measured, then the court cannot reach conclusions, as the statute requires, about the objective reasonableness of that interval.

█ Here, we are unable to address this third element—the time remaining between the Death Notice's filing and trial— with respect to Ferebe's section 3593(a) claim.[7] The record does not clearly reveal whether, at the instant the Death Notice was filed, a date existed on which Ferebe's trial was set to begin. We can discern that a trial date of September 10 had been set by the district court in December of the preceding year and that that trial date was never cancelled on the record by the court. That suggests that a trial date was set. But, the court's words, recorded at the September 7, 2001 hearing on Ferebe's motion to strike the Death Notice (the "Motion Argument") and in its September 12, 2001 oral opinion denying the motion (the "Order"), cast doubt on whether that date in fact remained fixed.

The district court, noting that the parties postponed their June and July pre-trial hearings and conferences after the conditional plea agreement was reached in June 2001, suggested that the postponements had the *practical* effect of cancelling the September 10 trial date. The court's

comments, however, do not establish that the trial start date was cancelled *in advance of the Death Notice's filing and irrespective of it.*

In particular, the district court said as follows from the bench:

I think that in looking at issues in both criminal trials and civil trials, you start with the schedule. And the schedule is a reality. It can be worked with in some cases. But if there are notice and other requirements, you start with when is the trial date, where were the notices filed, and you don't always assume that the trial date is flexible and can be moved.... [T]his trial has to be postponed in any event because once I was advised that Mr. Ferebe had changed his mind or that's the way things were looking and that the case was going to be worked out, resolved by a plea, the other things got set in and hearing dates that we had scheduled for June and July were taken off the table. So they've all not been met and the most crucial one being working up the questionnaire for the jury. *I've been advised by the jury section that that takes at least six to eight weeks. So that when the jury questionnaire selection dates all slipped, that meant that we were no longer looking at a September trial date. We're looking at something at least six to eight weeks beyond that.*

J.A. at 161 (Motion Argument) (emphasis added). And:

By the time [the Attorney General] made its [July 26] decision [rejecting the conditional plea agreement], the September 10 trial date was irretrievably lost. For one thing, I set in other matters for September tenth.

---

7. Because the district court relied on a prejudice analysis to decide the motion, it did not analyze this element, and, as the discussion below makes clear, its peripheral discussions

regarding the time trial was or was not set to begin and the time remaining before trial lack the precision and exactness necessary to the analysis.

Second, neither counsel for the defense nor counsel for the government, as of the date of the turndown in late July 2001 would have been ready for a trial starting on September the 10th.

*But the most crucial aspect as of the late July time period was that we had no jury questionnaire appropriate to a death penalty case.* The timetable for drafting, investigating, and approving such a questionnaire from which to pick a qualified death penalty jury, that timetable had slipped because of the decision by the court and counsel to stop work, to stay our oars and see what would happen in Washington.

*I have been advised by the jury section that it takes at least eight weeks to go through the process* of mailing the death penalty questionnaire, retrieving the responses, reviewing the responses with court and counsel, and bringing into court the qualified jury.

This case must, accordingly, be rescheduled, and any possible prejudice to Mr. Ferebe with respect to the guilt phase or the sentencing phase will be cured by the additional time that defense counsel will have to prepare their case [.]

J.A. at 214–15 (Order) (emphasis added).

The court's words at the Motion Argument are susceptible to two different interpretations. The court says that the trial was no longer scheduled to start September 10 "when the jury questionnaire selection dates all slipped," pointing to the parties' *pre*-Death Notice conduct as having voided the September 10 trial date as a practical matter. But, the court also indicates, at the same time, that the Death Notice's filing was itself the *but for* reason for finding the September 10 trial date to have been practically voided. Thus, the court noted the requirements of proceeding with *a capital trial* (the *result* of the

Death Notice's filing) as the hurdles to keeping the September 10 trial date. The former statement supports the conclusion that there was no set trial date at the moment the Death Notice was filed, while the latter supports the conclusion that the September 10 date was set at that moment, but that the court voided it *in order to accommodate* the capital trial called for by the prosecution's delinquent Death Notice.

The Order's language and analysis is not any more precise. The Order says that the "most crucial" factor necessitating a re-scheduling of the trial was the time it would take to construct the jury questionnaire and that that period would be at least eight weeks. This, of course, adds weight to the second interpretation we offer above of the court's Motion Argument comments. It, too, implies that the trial remained set for September 10, but that the court thought it necessary to re-schedule it *in order* to accommodate a capital trial.

That the September 10 trial date continued in force at the moment the Death Notice was filed is further suggested by the fact that the district court had in August issued a written query to Ferebe inquiring whether he "would be ready to go to trial on September 10, 2001," *see* J.A. at 206 (the Order). Ferebe responded that he "would be ready to go forward with trial on September 10, 2001[,] provided that the trial was a non-death penalty trial." *Id.* The query suggests that the court may have had in mind that the September 10 trial date remained in force as late as mid-August.

But, at the same time, the conclusion that the trial was set for September 10 at the moment the Death Notice was filed is undercut by the court's assertion that the trial date "was irretrievably lost" as a result of the postponement of the June and

July hearing dates. *Id.* at 214. This statement directly contradicts our preceding observations and suggests instead that the trial date was lost as a practical matter prior to the Death Notice's filing and irrespective of whether the death penalty would be under consideration at trial.[8]

These varied aspects of the district court's oral statements and the posture of the case make unknowable for us whether at the moment of the Death Notice's filing, and irrespective of the procedural effect of trying a capital case (which up until that point the trial was not), Ferebe's trial was set for September 10, for an equivalent date, or for no date at all.

Because we cannot determine whether, at the time of the Death Notice's filing, a date existed on which Ferebe's trial was set to start, we cannot complete an evaluation of the merits of Ferebe's claim. A court necessarily errs where it rules on a motion to strike a Death Notice under section 3593(a)'s timeliness requirement but no trial date is set, or no trial has begun. As explained above, without a date from which to measure the amount of time remaining from the filing to trial, a court cannot reach conclusions as to the objective reasonableness of *that* yet unknown and unidentified interval.

Thus, we must remand the case to allow the district court to address the motion again, this time under the proper analytical framework and with an eye towards deciding these unaddressed, yet indispensable, factual issues.[9]

### 2.

Having determined that the district court applied an incorrect prejudice analysis in its initial adjudication of Ferebe's motion to strike the Death Notice, and having determined that remand is necessary so as to develop the record further, we vacate the district court's order denying Ferebe's motion and remand to that court for further proceedings.

### CONCLUSION

The judgment of the district court is vacated and the case is remanded with instructions to proceed consistent with the opinion herein.

### VACATED AND REMANDED

NIEMEYER, Circuit Judge, dissenting:

Donald Ferebe, who has been indicted for two counts of capital murder, filed this interlocutory appeal to challenge, as untimely, the government's notice, given pursuant to 18 U.S.C. § 3593(a), of its intention to seek the death penalty. Section 3593(a) requires the government to serve notice of its intention to seek the death penalty "a reasonable time before the trial." The district court denied Ferebe's motion to strike as untimely the government's death penalty notice. Because trial has not yet occurred and the facts neces-

8. Similarly ambiguous are the district court's subsequent comments that "any possible prejudice to Mr. Ferebe will be cured by the additional time that defense counsel will have to prepare their case[,]" J.A. at 215, as these comments also beg the question of whether that "additional time" was a result of the fact that the trial date was truly lost (and not lost *because of* the Death Notice filing), or if it was instead a result of the delay in the trial occasioned by the Death Notice's delinquent filing (*i.e.*, the delays occasioned by the unique requirements of a capital trial, caused by litigation over Ferebe's objection to the Death Notice, or created by the court to provide additional time for Ferebe to prepare).

9. As should be evident from our discussion herein, district courts cannot decide challenges to Death Notices brought under section 3593(a)'s timeliness requirement *until* they have before them the requisite factual elements. Where they do otherwise, they err.

sary to review the reasonableness of the timing of the government's notice will not be ascertainable until the trial actually occurs, I would dismiss this appeal from the district court's order as interlocutory. *See* 28 U.S.C. § 1291.

The majority opinion views the statute as giving Ferebe a right *not to stand trial,* the violation of which must be determined *before* trial. Treating this right much as a double-jeopardy right, *ante* at 735–736, the majority concludes that a violation can be appealed before trial. To accomplish this, it reads the statute to require a death penalty notice to be given a reasonable time before the *date of trial, ante* at 737– 738, not before the *trial,* as the statute provides. The majority's approach of using the scheduled trial date rather than the trial itself as the benchmark for determining compliance with § 3593(a) rests satisfaction of this procedural guarantee on speculation that a trial will proceed as scheduled. This approach finds no analytical relevance in whether the defendant was actually prejudiced at trial or whether the period actually elapsing between the death penalty notice and trial was reasonable. In employing such an approach, the majority treats a *potential* violation of § 3593(a), which would be wholly vindicable post-trial, as one of those rare pretrial constitutional deprivations that the Supreme Court has found deserving of immediate appeal.

Because I conclude that the district court's order denying Ferebe's motion to strike the government's notice of its intention to seek the death penalty is an interlocutory order that is not appealable now (before trial) as a final judgment under 28 U.S.C. § 1291, I would dismiss this appeal.

I

On September 16, 1997, Ferebe was indicted, along with Haywood Carmichael, for, among other things, two counts of murder through the use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c), (j)(1). The indictment charged that on August 15, 1995, Ferebe shot Benjamin Harvey Page, a potential witness against Ferebe on an unrelated 1994 murder charge then pending, and Yolanda Evans, an innocent bystander caught in the crossfire. The offenses carry a possible sentence of death.

Upon receiving the recommendation of the U.S. Attorney to seek the death penalty on both counts against both defendants, the Attorney General of the United States convened a meeting of the death penalty review committee on April 2, 1998, at which counsel for both Ferebe and Carmichael presented arguments in mitigation of their clients' respective roles in the two murders. In May 1998, the Attorney General authorized the U.S. Attorney to seek the death penalty only on the one count charging Ferebe with the murder of Page. Following that decision, the district court severed the trial of Carmichael from that of Ferebe. Carmichael's case proceeded to trial, and he was sentenced to two concurrent terms of life imprisonment.

Ferebe, however, did not wish to proceed to trial. Rather, he filed a motion for a continuance and exclusion of the elapsed time from operation of the Speedy Trial Act, seeking an indefinite postponement of his trial until the appellate process could be completed on his conviction for the previous 1994 murder of Richard Thomas in furtherance of racketeering activity, to which Page had been a potential witness and for which Ferebe had been sentenced to life imprisonment. In his motion for an indefinite postponement in this case, Ferebe noted that "[t]his capital punishment case is currently scheduled for trial the week of April 26, 1999 .... [I]t is in the

interest of justice to postpone this case so that Mr. Ferebe's previous conviction may be appealed to the Fourth Circuit. Once the Fourth Circuit rules on Mr. Ferebe's appeal in his previous conviction, it may well then be possible for the parties to resolve this extremely difficult and protracted case without a trial." The district court granted the motion and postponed trial of Ferebe indefinitely, pending completion of the appellate process in Ferebe's prior murder conviction.

In September 1999, this court affirmed Ferebe's conviction and sentence on the prior charge, and in January 2000, the Supreme Court denied Ferebe's petition for a writ of certiorari. Turning his attention thereafter to this case, Ferebe was, at his request, returned in June 2000 to the District of Maryland from Terre Haute, Indiana, where he was serving his sentence on the prior conviction, to discuss with his counsel the possibility of resolving this case through a plea agreement. At that time, the government offered Ferebe the possibility of pleading guilty to the murders of both Page and Evans and agreeing to two concurrent life sentences to avoid the death penalty. But in October 2000, Ferebe declined the offer and insisted on proceeding to trial. In response, the district court conducted a hearing in December 2000, during which it received Ferebe's formal rejection of the government's offer and thereafter the government's formal withdrawal of the offer. A schedule for trial preparation and motions was then fixed, and a capital trial was scheduled to commence on September 10, 2001, with the explicit understanding by the parties and the court that the death penalty would be sought.

In May 2001, the U.S. Attorney asked the Attorney General in the new administration to reconsider the decision not to permit him to seek the death penalty with respect to the count charging Ferebe with the murder of Evans. A month later and before the Attorney General acted, counsel for Ferebe announced a "breakthrough" and advised the government that Ferebe was now ready to plead guilty to both murders in exchange for concurrent life sentences, and on June 20, a formal plea agreement was signed to that effect by both Ferebe and the U.S. Attorney, subject to the approval of the Attorney General. The district judge was advised of the development, and, because the plea agreement required the approval of the Attorney General, both the court and counsel ceased their preparations for the trial to await word from the Attorney General.

In early July 2001, the Attorney General granted the U.S. Attorney's earlier request to seek the death penalty on the Evans murder charge, and on July 26, the Attorney General advised the U.S. Attorney that the proposed plea agreement was not acceptable and that the prosecution of the case as a death penalty case should proceed. In a meeting with the court and all parties on July 31, defense counsel indicated Ferebe's desire to plead guilty even in the absence of agreement, explaining that such a plea would subject Ferebe only to life imprisonment because the government had not yet filed its notice of intention to seek the death penalty. The next day, on August 1, 2001, the government filed a formal notice, pursuant to 18 U.S.C. § 3593(a), of its intention to seek the death penalty for the murders of both Page and Evans.

Arguing that the death penalty notice was untimely, both because it was so late after the indictment was filed and so short before the September 10 scheduled trial date, which had not yet been postponed, Ferebe filed a motion to strike the notice. The district court conducted a hearing on the motion on September 7, 2001, during

the period originally set aside for a pretrial conference and, on September 12, denied Ferebe's motion to strike the death penalty notice. At the same time, the court postponed the trial date to a new date on which the parties could agree.

In denying Ferebe's motion to strike, the district court concluded that Ferebe had actual, albeit not formal, notice of the death penalty for the first count and that the preparation for the second death penalty count was not substantially different than that for the first count on which Ferebe had actual notice. Recognizing that the statutory standard for timeliness was that the notice be served a "reasonable time before the trial" or before the court's acceptance of a guilty plea, the court concluded that the most important factor in determining "reasonableness" was to examine any "prejudice to Mr. Ferebe" that the timing of the notice caused. With respect to the Page murder charge, the court concluded that there had been no prejudice:

> This case was scheduled on December 15, 2000 as a death penalty case. Defense counsel has had ample time and financial resources to prepare for a death penalty case involving the murder of Benjamin Page. They have received discovery, including a transcript of the Carmichael trial, and they have filed motions appropriate in scope and dignity of preparation to a death penalty case.

With respect to the Evans murder charge, the court concluded that "the evidence for the Page murder is basically the same for the Yolanda Evans murder, except for certain forensic evidence learning how she was killed as she was sitting on the stoop that afternoon." Accordingly, the court concluded that there was also no actual prejudice with respect to Evans, even though the death penalty notice gave the defense its first formal notice of the government's intent to seek the death penalty on the Evans murder charge. While the court acknowledged that there was a potential for prejudice with respect to the Evans murder charge—because defense counsel did not have as much preparation time for that charge—the court concluded that "any prejudice accruing to the defendant will be cured by the time that must pass between the original trial date of September 10, 2001 and the new trial date that I must schedule at the end of this hearing." The court explained that counsel for both sides, as well as the court, "stop[ped] work in the expectation that Washington would approve the plea bargain. Washington's turndown in late July was not expected, but it was also not unforeseeable." The court noted that by the time the plea agreement was turned down, "the September 10 trial date was irretrievably lost" by the actions of both parties and the court. The court explained that it had scheduled other matters for September 10 and that neither counsel could have been ready by September 10 in view of the suspension of activities pending approval by the Attorney General. The court explained further:

> But the most crucial aspect as of the late July time period was that we had no jury questionnaire appropriate to a death penalty case. The timetable for drafting, investigating, and approving such a questionnaire from which to pick a qualified death penalty jury, that timetable had slipped because of the decision by court and counsel to stop work, to stay our oars and see what would happen in Washington.
>
> I have been advised by the jury section that it takes at least eight weeks to go through the process of mailing the death penalty questionnaire, retrieving the responses, reviewing the responses with court and counsel, and bringing into court the qualified jury.

.

This case must, accordingly, be re-scheduled.

Pursuant to the court's invitation to have parties agree on a trial date, Ferebe thereafter agreed to a trial on April 7, 2003 (which is now also lost because of this appeal), and agreed to exclusion of the elapsed time for Speedy Trial Act purposes.

From the district court's interlocutory order of September 12, 2001, denying Ferebe's motion to strike the death penalty notice as untimely under 18 U.S.C. § 3593(a), Ferebe filed this interlocutory appeal.

On appeal, Ferebe contends on the merits that the government's formal notice to seek the death penalty, served on August 1, 2001, when trial was still formally scheduled to take place on September 10, 2001, was untimely. Ferebe argues that the government violated the requirements of a timely filing imposed by 18 U.S.C. § 3593(a) by "waiting more than three years after the death penalty was authorized, ignoring the deadline for filing motions, and waiting, without reason, until just 39 days before trial."

The government contends on the merits that the September 10, 2001 trial date was effectively suspended in June 2001 by the court and all counsel when the parties sought the Attorney General's approval of a proposed plea agreement. The government also asserts that Ferebe had actual notice of the death penalty and of the aggravating factors to support it since November 1998 when Carmichael, Ferebe's co-defendant, was convicted, and that even before the *de facto* suspension of the calendar in June 2001, Ferebe had filed all of his motions and had conducted his discovery.

II

The government first contends, however, that we do not have jurisdiction to hear this appeal because the district court's order of September 12, 2001, denying Ferebe's motion to strike the death penalty notice, was not a final order, as required by 28 U.S.C. § 1291. Ferebe responds to this contention with the argument that his appeal is justified by the collateral order doctrine, articulated in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). I agree with the government that the district court's order is not appealable at this time.

Section 1291 of Title 28 confers on the Courts of Appeals "jurisdiction of appeals from all final decisions ... except where a direct review may be had in the Supreme Court." 28 U.S.C. § 1291. Because jurisdiction is a creature of statute and § 1291 is the purported source of jurisdiction for this appeal, our authority to hear Ferebe's appeal depends on whether the "finality" predicate of § 1291 is satisfied. As the Supreme Court has stated, "[t]he effect of the statute is to disallow appeal from any decision which is tentative, informal or incomplete." *Cohen*, 337 U.S. at 546, 69 S.Ct. 1221. But in construing the finality requirement of § 1291, the Court in *Cohen* articulated a "collateral order doctrine" to permit review of certain orders not terminating the action but otherwise "final" within the meaning of the statute. *Id.* at 545–47, 69 S.Ct. 1221. The Court recognized such orders as "final decisions" when they are "separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* at 546, 69 S.Ct. 1221.

The collateral order doctrine may be applied only if three requirements are sat-

isfied. *First,* the district court's order must have conclusively determined the disputed question. *Cohen,* 337 U.S. at 546, 69 S.Ct. 1221; *Abney v. United States,* 431 U.S. 651, 658, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). *Second,* the order must have resolved an important issue completely separate from the merits. *Cohen,* 337 U.S. at 546, 69 S.Ct. 1221; *Abney,* 431 U.S. at 658, 97 S.Ct. 2034. And, *third,* the order must be effectively unreviewable on appeal from final judgment. *Cohen,* 337 U.S. at 546, 69 S.Ct. 1221; *Abney,* 431 U.S. at 658, 97 S.Ct. 2034.

Because of Congress' expressed disfavor of piecemeal litigation, the doctrine has been strictly applied, particularly in criminal litigation where delays are directly contrary to the social interest in speedy resolution of criminal matters. *See United States v. MacDonald,* 435 U.S. 850, 853–54, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978) ("The rule of finality has particular force in criminal prosecutions because 'encouragement of delay is fatal to the vindication of the criminal law' ") (quoting *Cobbledick v. United States,* 309 U.S. 323, 325, 60 S.Ct. 540, 84 L.Ed. 783 (1940)); *see also United States v. Lawrence,* 201 F.3d 536, 537 (4th Cir.2000) (noting the infrequent use of the doctrine to hear interlocutory appeals in criminal cases). Indeed, the Supreme Court has only employed the collateral order doctrine in three criminal matters. *See Helstoski v. Meanor,* 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979) (permitting immediate appeal of immunity afforded by the Speech and Debate Clause); *Abney,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (permitting immediate appeal of denial of double jeopardy claim); *Stack v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951) (permitting immediate appeal of denial of motion to reduce bail). The Supreme Court has "repeatedly stressed that the 'narrow' exception should stay that way and never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated." *Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 868, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994) (internal citations omitted). The Court has further instructed that "the issue of appealability under § 1291 is to be determined for the entire category to which a claim belongs, without regard to the chance that the litigation at hand might be speeded, or a particular injustice averted by a prompt appellate court decision." *Id.* (internal quotation marks and citations omitted). While recognizing this restrictive approach, we have nonetheless applied the collateral order doctrine in a criminal case to allow the immediate appeal of the denial of the right to be tried as a juvenile. *See United States v. Smith,* 851 F.2d 706 (4th Cir. 1988).

### III

In order to apply these well-established principles of the collateral order doctrine to this case, it is necessary to understand the statutory basis for the order from which appeal was taken.

The order denying Ferebe's motion to strike was based on 18 U.S.C. § 3593(a), which provides:

If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, *a reasonable time before the trial* or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice—

(1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and

(2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

\* \* \*

The court may permit the attorney for the government to amend the notice upon a showing of good cause.

18 U.S.C. § 3593(a) (emphasis added). By requiring the government to serve a death penalty notice "a reasonable time before the trial," Congress does not mandate a particular deadline for providing the notice. *Compare* 18 U.S.C. § 3593(a) *with* 18 U.S.C. § 3432 (requiring that indictments and lists of jurors and witnesses in a capital case be disclosed "at least *three entire days before commencement of trial*") (emphasis added); *see also, e.g.,* Fed. R.Crim.P. 12.1(b) (requiring government to give defendant notice of witnesses it will use to rebut alibi-witness testimony "no later than *10 days before trial*") (emphasis added); Fed.R.Crim.P. 12.3(a)(3) (requiring government to give defendant notice of its response to a public-authority defense "no later than *20 days before trial* ") (emphasis added). Instead, the critical determination under § 3593(a) is whether the notice was provided *a reasonable time before trial. Cf. United States v. Smith Grading & Paving, Inc.,* 760 F.2d 527, 532 (4th Cir.1985) (requiring that *Brady* material be disclosed "in time for its effective use at trial," which could even include disclosure at trial itself).

In applying the reasonableness standard to the timing of a notice requirement, we must be guided by the purpose for which notice is required and the context in which it is required to be given. The statute under review in this case—18 U.S.C. § 3593(a)—functions to inform the defendant and the court of the fact that the government will seek the death penalty at trial and of the grounds on which it will seek that penalty. This requirement affords the defendant an opportunity to prepare his defense, targeting specifically the death penalty aspect of trial. And in guilty pleas, to which the statute also applies, the requirement assures that the defendant and the court have notice of the penalty to be sought at the sentencing phase and of aggravating factors relevant to a death sentence. In short, for the defendant this statute is a procedural guarantee that he will be given adequate time to prepare for a death penalty trial and sentencing, and its guarantee is similar in nature to many other guarantees that give the defendant an opportunity to prepare. *See, e.g.,* 18 U.S.C. § 3432 (requiring pre-trial notice of indictments and lists of jurors and witnesses in a capital case); Fed.R.Crim.P. 12.1(b) (requiring pretrial notice by the government of witnesses to be called to rebut an alibi defense); Fed.R.Crim.P. 16(a) (requiring government pretrial disclosure of evidence); Fed.R.Crim.P. 26.1 (requiring pretrial notice of the use of foreign law); *Smith Grading & Paving, Inc.,* 760 F.2d at 532 (requiring disclosure of *Brady* material "in time for its effective use at trial").

I thus disagree with the majority's expansive reading of § 3593(a)—which it interprets as protecting the right "not to stand trial for one's life absent [adequate time to prepare]," *ante* at 729, and the right "not to be forced to endure a capital trial except upon reasonable notice," *ante*

at 729—and its analogy to double jeopardy claims to find Ferebe's claim immediately appealable, *ante* at 735–736. I do not find in the death penalty notice statute language that supports the conclusion that the defendant is given a substantive right not to stand trial for a capital offense. Because "virtually every right that could be enforced appropriately by pretrial dismissal might loosely be described as conferring a 'right not to stand trial,' " *Digital Equip.*, 511 U.S. at 873, 114 S.Ct. 1992, the Supreme Court has instructed that " § 1291 requires courts of appeals to view claims of a 'right not to be tried' with skepticism, if not a jaundiced eye,' " *id.*; *see also Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989) ("One must be careful . . . not to play word games with the concept of a 'right not to be tried' "). As the Supreme Court noted in *MacDonald*:

> Admittedly, there is value—to all but the most unusual litigant—in triumphing before trial, rather than after it, regardless of the substance of the winning claim. But this truism is not to be confused with the quite distinct proposition that certain claims (because of the substance of the rights entailed, rather than the advantage to a litigant in winning his claim sooner) should be resolved before trial.

*MacDonald*, 435 U.S. at 860 n. 7, 98 S.Ct. 1547. And a "right not to be tried" depends upon "an explicit statutory or constitutional guarantee that trial will not occur." *Midland Asphalt*, 489 U.S. at 801, 109 S.Ct. 1494; *see, e.g., id.* at 802, 109 S.Ct. 1494 (noting that the Grand Jury Clause satisfies this requirement because it states that "[n]o person shall be held to answer"

for a crime without a grand jury indictment); *Digital Equip.*, 511 U.S. at 870, 114 S.Ct. 1992 (stating that the Double Jeopardy Clause "by its very terms" embodies the principle of a "right 'not to face trial at all' "). "[T]he mere identification of some interest that would be 'irretrievably lost' has never sufficed to meet the third *Cohen* requirement" to permit appeal to avoid trial entirely. *Digital Equip.*, 511 U.S. at 872, 114 S.Ct. 1992 (citation omitted). As the Supreme Court stated in *MacDonald* with respect to speedy trial claims:

> There perhaps is some superficial attraction in the argument that the right to a speedy trial . . . must be vindicated before trial in order to insure that no nonspeedy trial is ever held. Both doctrinally and pragmatically, however, this argument fails. Unlike the protection afforded by the Double Jeopardy Clause, the Speedy Trial Clause does not, either on its face or according to the decisions of this Court, encompass a "right not to be tried" which must be upheld prior to trial if it is to be enjoyed at all. It is the delay before trial, not the trial itself, that offends against the constitutional guarantee of a speedy trial.

435 U.S. at 860–61, 98 S.Ct. 1547.

Similarly, the protection afforded to the defendant by § 3593(a) is not a right not to be tried as a capital defendant. Instead, it is a procedural guarantee ensuring that the defendant has a sufficient time for preparation between the government's death penalty notice and trial. Indeed, the plain language of the statute provides no assurance that a capital trial can be denied if the government fails to produce a timely notice of its intent to seek the death penalty.[1]

---

1. The majority argues that my use of the word "guarantee" to describe the procedural protection afforded to a defendant by § 3593(a) contradicts my conclusion that § 3593(a) does not permit pretrial appellate review of allegedly untimely death notices. *Ante* at 731.

Recognizing the statute's role of assuring the defendant in a capital case adequate preparation time, the guide for determining a "reasonable" time must focus on the preparation denied or adversely affected by a notice allegedly given late. And ultimately the adverse effect of preparation can only be measured by the defense that the defendant presented at trial. Thus, the reasonableness of any time before trial will depend in large part on the nature and complexity of the case and an evaluation of the preparation the defendant was able to undertake.

The analysis called for is not unlike that which has been adopted for determining whether a defendant's speedy trial right has been violated. While there are obvious differences between a claim that the defendant was denied the right to receive a timely death penalty notice and a claim that the defendant was denied a speedy trial, prejudice caused by the delay is a factor common to both analyses. See *Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) ("Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect"). In *Barker*, the Court identified the potential "inability of a defendant adequately to prepare his case" as the most serious aspect of prejudice. *Id.* And subsequently emphasizing the importance of being able to evaluate prejudice, the Court in *MacDonald* noted that any effort to assess this prejudice before the trial would "tend[ ] to be speculative," 435 U.S. at 858, 98 S.Ct. 1547 and that "there exists no . . . divorce between the question of prejudice to the conduct of the defense (which so often is central to an assessment of a speedy trial claim) and the events at trial," *id.* at 859, 98 S.Ct. 1547. Indeed, it was just this speculation and inseparability from the merits that prompted the Court in *MacDonald* to conclude that a *"pretrial* denial of a speedy trial claim can never be considered a complete, formal, and final rejection" of the speedy trial right. *Id.* at 859, 98 S.Ct. 1547 (emphasis added).

In addition to prejudice, the Supreme Court in *Barker* identified other factors for consideration in determining whether a delay of trial was unreasonable. The Court in *MacDonald* summarized the factors as follows:

Inherent in this assertion is the assumption that a guarantee must include immediate appellate review. Immediate interlocutory appellate review, however, is not essential to a guarantee. Indeed, almost all pretrial procedural guarantees, such as pretrial rights of disclosure of *Brady* material, *Jencks* material, alibi rebuttal witnesses, and the like, do not include a right to interlocutory appeals. Even the right to be tried on an indictment in compliance with the Constitution is not vindicated by interlocutory appeal. Trials, including pretrial orders, involve a multitude of important issues that are routinely and normally reviewed after judgment. Only in the rare circumstances where an issue cannot effectively be reviewed after final judgment is an exception made.

The majority also argues that my analysis requires the "error" "that defendants who never receive notice that they are to be tried for their life must endure trial, conviction, death sentence, and death row imprisonment before they may appeal the denial of their objection to receiving no notice." *Ante* at 733–734. But this assertion is true only if one accepts the majority's characterization of the statutory notice right as a right not to stand trial, a characterization drawn in the face of weighty Supreme Court authority counseling courts to "view claims of a 'right not to be tried' with . . . a jaundiced eye." *See Digital Equip.,* 511 U.S. at 873, 114 S.Ct. 1992. Although allegedly no notice is easier to identify than notice allegedly provided an unreasonable time before trial, that distinction does not transform a violation of § 3593(a)—whether before or after trial begins—into a right to entirely avoid trial. As I have noted in this opinion, a violation of § 3593(a) can be remedied by an array of responses.

In *Barker* ... the Court listed four factors that are to be weighed in determining whether an accused has been deprived of his Sixth Amendment right to a speedy trial. They are the length of the delay, the reason for the delay, whether the defendant has asserted his right, and prejudice to the defendant from the delay. [*Barker*, 407 U.S.] at 530, 92 S.Ct. 2182. The Court noted that prejudice to the defendant must be considered in the light of the interests the speedy trial right was designed to protect: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*, at 532, 92 S.Ct. 2182 (footnote omitted).

435 U.S. at 858, 98 S.Ct. 1547.

Because the speedy trial analysis focuses on delay and on the prejudice that the delay will cause to the ability of the defendant to present his defense, it is relevant to the death penalty notice analysis which too must evaluate the extent to which an allegedly late notice affects the defendant's ability to present his defense.

Thus, in determining what timing is a reasonable time before trial for giving the death penalty notice under 18 U.S.C. § 3593(a), I would conclude that a court should at least consider (1) the nature of the charges made in the indictment; (2) the nature of the aggravating factors provided in the death penalty notice; (3) the period of time before trial that the notice was received by the defendant; (4) any actual notice that the defendant had received before the formal notice was filed and the extent to which the defendant was able to prepare based on that notice; and

(5) the prejudice that the timing of the formal notice has on the defendant's preparation for trial and on his presentation of the defense. Obviously, if the jury were to determine not to impose the death penalty, then any alleged violation of § 3593(a) would become moot.

The analysis proffered by the majority eclipses any consideration of what effect an allegedly late notice would have on trial preparation and thus the prejudice it causes the defendant. It focuses on the *right* to such notice prospectively, making the inquiry a *pretrial* matter that evaluates "objective reasonableness of the notice provided." *Ante* at 731. From that posture, the analysis finds irrelevant any determination of whether the actual historical facts indeed frustrated the purpose of § 3593(a) to afford an adequate preparation time, focusing instead in the abstract—and necessarily therefore upon speculation—about whether the defendant's right to have § 3593(a) enforced was denied "at the point when [the defendant] proceeds toward trial." *Ante* at 732. Apart from the speculation that this requires, it also yields no possibility of determining *when* a violation occurred because the violation as defined by the majority occurs within the hurtle forward toward trial. Such an approach encourages defendants to file, and district courts to rule on, challenges to § 3593(a) notices as soon as the notices are filed. It also freezes the inquiry into the reasonableness of timing as of the time the notice is filed and presents the district court, in effect, with only the options of striking the notice or not striking the notice. It denies the court any flexibility in managing the period of trial preparation by scheduling or postponing trial to give the defendant a reasonable time to prepare. For if the district court

tries to take this route, its attempt will be cut off by an immediate appeal.

Moreover, the majority's proffered analysis cannot withstand the analysis for assessing the reasonableness of pretrial delay demanded by the Supreme Court in *Barker*. While that analysis evaluated the speedy trial right, it still involved an inquiry into the reasonableness of pretrial delay, concluding that prejudice was the most serious factor for consideration. Yet the majority's pretrial analysis, of necessity, cannot take prejudice into account. Accordingly, it concludes, as it must, that any prejudice is irrelevant. *Ante* at 732. This approach overlooks the entire purpose for which notice is required under § 3593(a).

Finally, the majority's analogy to allegedly defective indictments, to dismiss any consideration of prejudice for allegedly late death penalty notices, overlooks § 3593(a)'s explicit standard of *reasonableness*. And the majority's analysis ignores the aspect of indictments that *is* analogous to death penalty notices that both indictments and death penalty notices contain elements inextricably bound up with the merits of the case.[2]

In sum, we are presented in this appeal with a pretrial order denying a defendant's motion to strike a death penalty notice made on the ground that it was not given a "reasonable time before the trial." 18 U.S.C. § 3593(a). Yet, the trial that is referred to in the statute has not even as of now commenced, much less been completed. Because there has been no trial, no one can conclusively determine whether the notice was given a *reasonable* time before trial. Moreover, no one can state whether the defendant was adversely affected in any way by a notice which cannot even be denominated "late."[3]

In this context, I now apply the three requirements for finding "finality" under the collateral order doctrine.

## IV

Applying the three *Cohen* factors for determining whether the district court's order denying Ferebe's motion to strike the death penalty notice was a final judgment for purposes of 28 U.S.C. § 1291, I

2. If a death penalty notice under § 3593(a) contains " 'charging' elements [that] only pertain to sentencing," *ante* at 736 n. 5, one must wonder how the majority reconciles its analysis to the date of trial, rather than to the date of sentencing.

3. Responding to an analysis of prejudice as part of the reasonableness inquiry, the majority is simply incorrect in stating that incorporation of prejudice into the analysis of whether notice was provided a *"reasonable* time before the trial," 18 U.S.C. § 3593(a), *"necessarily* leads to the untenable conclusion that the statute would be satisfied if notice were given after trial commenced or, for that matter, *never* given." *Ante* at 732. If notice is given after trial has commenced, the objection would be that notice was given after trial commenced, not that notice was given an "[un]reasonable time *before* trial." Likewise, if notice is never given, the objection would be that notice was never given. Here, however, notice *was* given, and notice was given *before* trial, and the only challenge is to whether the notice was given a *reasonable* time before trial.

The majority also states that a prejudice-based analysis "necessitates [of district courts] a *post*-trial adjudication" of motions to strike death penalty notices, suggesting that a district court, under my analysis, would not be in a position to rule on a pretrial motion to strike. *Ante* at 730 n. 4. But this general criticism is applicable to almost all pretrial and trial motions that district courts have authority to consider and that appellate courts review under a prejudice standard. The majority's criticism also overlooks the ordinary course of litigation in which the defendant can appeal the district court's unfavorable rulings when they merge into the final judgment, not in a piecemeal fashion.

first observe that the district court's order in this case did not conclusively determine the disputed question, namely whether the death penalty notice was filed a reasonable time before trial. Unlike the denial of a double jeopardy claim or a decision to try a juvenile as an adult where "[t]here are simply no further steps that can be taken in the District Court to avoid the trial the defendant maintains is barred," *Abney,* 431 U.S. at 659, 97 S.Ct. 2034, the district court's order, finding that the death penalty notice was served a reasonable time before trial, is merely speculative at this point. It leaves open the question of the potential prejudice to Ferebe of trying a death penalty case with inadequate preparation time. If Ferebe, during or after trial, renews his motion to strike, the court will be able to evaluate the merits of his motion in light of the period between the government's death penalty notice and the trial date to determine whether the notice was filed a reasonable time before the trial. The district court's denial of Ferebe's motion on September 12, 2001, before the trial commenced, could not be *conclusive* as there remain further steps available to Ferebe at the trial-court level to vindicate his statutory right. Thus, a more apt analogy is to a speedy trial claim, which is of a speculative nature before trial and which the Court in *MacDonald* found not to satisfy the collateral order doctrine. The Court explained:

> Before trial, of course, an estimate of the degree to which delay has impaired an adequate defense tends to be speculative. The denial of a pretrial motion to dismiss an indictment on speedy trial grounds does not indicate that a like motion made after trial—when prejudice can be better gauged—would also be denied. Hence, pretrial denial of a speedy trial claim can never be considered a complete, formal, and final rejection by the trial court of the defendant's

contention; rather, the question at stake in the motion to dismiss necessarily "remains, unfinished [and] inconclusive" until the trial court has pronounced judgment.

*Id.* at 858–59, 98 S.Ct. 1547 (quoting *Cohen,* 337 U.S. at 546, 69 S.Ct. 1221). Just as the resolution of a speedy trial claim "necessitates a careful assessment of particular facts of the case," *MacDonald,* 435 U.S. at 858, 98 S.Ct. 1547, consideration of whether a death penalty notice was submitted reasonably before trial requires knowledge of the length of time between the notice and trial, as well as an assessment of the particular facts of the case. We may only weigh these factors after trial has occurred. For this reason, the district court's order is inconclusive within the meaning of *Cohen.*

Second, the timeliness of the death penalty notice filing is not an issue sufficiently separate from the merits to satisfy the collateral order doctrine. Again, *MacDonald* is instructive. In *MacDonald,* the Court stated that whether the defendant had been prejudiced by the length of delay before trial—the critical determination in speedy trial claims—often depends on the events at trial. 435 U.S. at 859, 98 S.Ct. 1547. The Court stated:

> The essence of a defendant's [speedy trial] claim in the usual case is that the passage of time has frustrated his ability to establish his innocence of the crime charged. Normally, it is only after trial that that claim may fairly be assessed.

*Id.* at 860, 98 S.Ct. 1547. The same may be said for Ferebe's claim that the death penalty notice was not served within a reasonable time before trial. The timeliness of a death penalty notice depends on the "reasonableness" of the time it was provided before trial, measured by how the defendant's preparation was affected, and that question, in turn, depends on the evi-

dence for and against the defendant and the complexity of the case as may be revealed during the course of trial. Because Ferebe's claim requires such an analysis, it is not sufficiently separate from the merits to satisfy the second requirement of the collateral order doctrine. *See Flanagan v. United States,* 465 U.S. 259, 268, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984) ("It is sufficient to note that the second condition [of the collateral order doctrine]—that the order be truly collateral—is not satisfied if petitioners' asserted right is one requiring prejudice to the defense for its violation").

Finally, and perhaps most important to the analysis, an untimely death penalty notice remains effectively reviewable upon final judgment. Proceeding with trial does not deny Ferebe any relief available for a violation of the statutory requirement to provide a death penalty notice within a reasonable time before trial. Rather, Ferebe retains the full rights to review and remedy such a violation at the end of the case, assuming he is convicted and sentenced to death or Ferebe objects to a noncapital sentence based on an inadequate preparation for a death penalty trial caused by an untimely § 3593(a) notice. The Supreme Court cases again are particularly instructive. In the three pretrial criminal matters in which the Supreme Court has identified an immediately reviewable collateral order within *Cohen*'s formulation, the case involved "an asserted right[,] the legal and practical value of which would be destroyed if it were not vindicated before trial." *Mac–Donald,* 435 U.S. at 860, 98 S.Ct. 1547 (citing *Helstoski,* 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (Speech and Debate Clause claim); *Abney,* 431 U.S. at 651, 97 S.Ct. 2034 (double jeopardy claim); *Stack v. Boyle,* 342 U.S.

1, 72 S.Ct. 1, 96 L.Ed. 3 (1951) (right to reduced bail claim)); *see also MacDonald,* 435 U.S. at 856, 98 S.Ct. 1547 (identifying the lack of an opportunity for vindication as perhaps the most important factor influencing the conclusion in *Abney* ); *id.* at 861 n. 7, 98 S.Ct. 1547 ("Certainly, the fact that this Court has held dismissal of the indictment to be the proper remedy when the Sixth Amendment right to a speedy trial has been violated ... does not mean that a defendant enjoys a 'right not to be tried' which must be safeguarded by interlocutory appellate review"). And we reached the same conclusion in *Smith,* noting that "much of the sequellae of [the defendant's] right to be tried as a juvenile, if that claim is meritorious, would be irretrievably lost" if the denial of the right were not afforded immediate appeal. *Smith,* 851 F.2d at 708. Unlike rights where immediate appeal is the only way to vindicate wrongful denial of the right, a timeliness objection to a death penalty notice does not become effectively unreviewable after the trial is held. Indeed, it may often be that it is *only* effectively reviewable then. Assuming conviction, a district court's order erroneously denying a motion to strike the death penalty notice is effectively reviewable because improper notice is vindicated through a new trial or through resentencing after striking the death penalty notice. *See Midland Asphalt,* 489 U.S. at 800, 109 S.Ct. 1494 (stating that if the alleged violation for which interlocutory appeal is sought can "provide the basis for reversal of a conviction on appeal, it is obvious that [it is] not effectively unreviewable on appeal from a final judgment" (quotation marks omitted)).[4]

**4.** The Supreme Court in *MacDonald* also recognized the limitless character of appeals on speedy trial grounds, an additional argument against immediate appealability applicable to Ferebe's claim as well. The Court stated: Unlike a double jeopardy claim, which requires at least a colorable showing that the

In sum, the district court's order denying Ferebe's motion to strike the death penalty notice satisfies none of the three *Cohen* requirements.

## V

Beyond any analysis under the collateral order doctrine, Ferebe suggests that the unique nature of capital cases in general merits our immediate review of this appeal. While I acknowledge that the gravity of a possible death sentence may elevate the intensity of trial preparation, to allow an immediate review of Ferebe's claim based on that ground would essentially allow interlocutory appeals of every dispositive motion in a death penalty case, wholly frustrating the policies against piecemeal appeals and favoring speedy trials in criminal cases. The proper safeguard against an untimely death penalty notice is an appeal after trial when the right can be completely reviewed and the violation adequately sanctioned.

Alternatively, Ferebe argues that if the district court's order is not an appealable collateral order, we should grant his request for a writ of mandamus to review the district court's interlocutory order. For the reasons given above, I also reject that request. The timeliness of a death penalty filing—which, if not mooted, can be vindicated after the trial—does not warrant issuance of such an extraordinary writ.

Accordingly, I would conclude that we do not have jurisdiction to hear this appeal at this time.

---

defendant once before has been in jeopardy of federal conviction on the same or a related offense, in every case there will be some period between arrest or indictment and trial during which time "every defendant will either be incarcerated ... or on bail subject to substantial restrictions on liberty." Thus, any defendant can make a pretrial motion for dismissal on speedy trial grounds and, if § 1291 is not honored, could immediately appeal its denial.

435 U.S. at 862–63, 98 S.Ct. 1547. Likewise, in every case in which the government files a death penalty notice, the defendant would experience a period of time between receipt of the notice and the time of trial and, "if § 1291 is not honored, could immediately appeal its denial." *See id.* at 863, 98 S.Ct. 1547. "[T]here is nothing about the circumstances that will support a [late death penalty notice] claim which inherently limits the availability of the claim." *Id.* at 862, 98 S.Ct. 1547.