**UNITED STATES of America, Plaintiff**

v.

**Quentin S. PONDER, Defendant.**

**No. CRIM. 4:04CR103.**

United States District Court,
E.D. Virginia,
Newport News Division.

Nov. 30, 2004.

Stephen Westley Haynie, United States Attorney's Office, Norfolk, VA, for Plaintiff.

James Orlando Broccoletti, Zoby & Broccoletti, Larry Mark Dash, Office of the Federal Public Defender, Norfolk, VA, Gerald Thomas Zerkin, Office of the Public Defender, Richmond, VA, for Defendant

## MEMORANDUM OPINION AND ORDER

DOUMAR, District Judge.

Defendant Quentin Shannon Ponder stands accused of capital murder and related offenses in connection with the death of his mother, Gloria J. Ponder. The Government has filed a Notice of Intent to Seek the Death Penalty, which is commonly referred to as a Death Notice. Presently before the Court is Defendant's Motion to Strike the Death Notice, alleging that it was not filed a reasonable time before trial and therefore must be invalidated pursuant to 18 U.S.C. § 3593(a). As the timing of the Death Notice was objectively reasonable with respect to the proposed trial date, particularly in light of the case's procedural posture and the Court's case management, the Motion is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Preliminary Procedural History

Defendant Quentin Shannon Ponder was arrested in Arizona on June 12, 2004 as a result of a Criminal Complaint filed and sealed in the Eastern District of Virginia warranting his arrest in connection with the apparent homicide of his mother, Gloria J. Ponder. The homicide is alleged to have taken place on June 1, 2004 on Langley Air Force Base in Hampton, Virginia, which is within the special maritime and territorial jurisdiction of the United States and the Eastern District of Virginia. *See* 18 U.S.C. § 7. On June 24, 2004, the Defendant was committed to the Eastern District of Virginia and the Office of the Federal Public Defender was appointed to represent him. Thereafter, a preliminary detention hearing was conducted on June 28, 2004 by a United States Magistrate Judge, who ordered that the Defendant be held without bond pending disposition of anticipated murder and related criminal charges. Assistant Federal Public Defender Larry M. Dash entered a notice of appearance as Defendant's attorney of record on June 29, 2004.

On July 21, 2004, a Grand Jury in the Eastern District of Virginia returned a four-count indictment charging the Defendant with, *inter alia,* (premeditated) murder in violation of 18 U.S.C. § 1111, an offense punishable by death. The Defendant came on for arraignment before a United States Magistrate Judge on July 28, 2004, at which time a pretrial discovery and inspection order was entered pursuant to Federal Rule of Criminal Procedure 16. Upon joint motion of the parties, formal arraignment was continued until August 4, 2004.

On August 3, 2004, this Court appointed Attorney James Broccoletti, who has experience defending capital murder cases, to serve as co-counsel with Mr. Dash pursuant to 18 U.S.C. § 3005. *See also United States v. Boone,* 245 F.3d 352, 361 (4th Cir.2001) (holding that a defendant charged with an offense punishable by death is entitled to two attorneys, regardless of whether the death penalty is actually sought). The Defendant again came on for arraignment before a United States Magistrate Judge on August 4, 2004, at which time he explicitly waived his rights under the Speedy Trial Act, 18 U.S.C. § 3161, and trial was initially set down for December 13, 2004. The deadline for pretrial motions was established as September 7, 2004, which, pursuant to a joint motion of the parties, was subsequently extended until September 21, 2004 by the United States Magistrate Judge on duty that day. That deadline passed without the filing of any pretrial motions.

### B. October 27, 2004 Status Conference

Concerned that no preliminary motions or any other action had been taken in this case as of October 22, 2004, a full month after the deadline for filing pretrial motions, this Court entered an Order (Doc. No. 18) that day commanding the parties to appear for a status conference in open court on October 27, 2004. Assistant United States Attorneys Stephen Haynie and Joseph DePadilla appeared for the Government. Mr. Dash and Mr. Broccoletti were both present on behalf of the Defendant. Pursuant to this Court's Order, Defendant Ponder also attended.[1]

The main issue addressed at the status conference was the practicability of the proposed December 13, 2004 trial date in light of the analytic intricacy of the evidence involved, the expansive nature of the parties' respective investigations, and the status of discovery. Mr. Dash reported to the Court that, due to no fault of the Government, defense counsel had not yet received discovery materials related to the prosecution's case-in-chief. Tr. at 4–5, Doc. No. ___ (Oct. 28, 2004). In particular, because DNA tests on alleged forensic evidence were still being conducted by the Government's examiners at the Department of the Army, information that might prove essential to either or both the prosecution's case-in-chief and the defense's trial strategy was not yet available. *Id.* at 4–6. Mr. Dash represented that he and Mr. Broccoletti would need time to review the results of the Government's DNA analysis and to engage experts to conduct an independent analysis of their own. *Id.* at 10–11. He also noted that the defense was pursuing evidentiary leads across the country due to the Defendant's alleged flight and seeking out witnesses as far away as Germany because the Defendant lived there for a period of time. *Id.* As a result, Mr. Dash believed that trial could not begin until late March or early April-*at*

---

1. Due to the seriousness of the crime charged and the severity of the potential punishment, the Court has ordered that Defendant Ponder be present for all hearings related to this case.

*the earliest*-and he requested that the Court grant a continuance. *Id.* at 13.

Mr. Haynie agreed that the December 13, 2004 trial date was not practicable. *Id.* at 5–7. He communicated that the Government's investigation also spanned across the country and reported that the DNA analysis being conducted by examiners with the Department of the Army would not be complete until the last week of November, at the earliest. *Id.* He assured the Court and defense counsel that he would turn over the results as soon as they were complete and that he would have no objection to a continuance and to the extension of the motions deadline. *Id.* at 6. Finally, Mr. Haynie also revealed that the Government was still in the process of collecting evidence and that, based on newly discovered evidence, it might seek a superseding indictment. *Id.* at 6, 8.

In addition to discussing the feasibility of the December 13, 2004 trial date, the Court also queried the Government concerning whether it intended seek the death penalty. Mr. Haynie informed the Court that a decision had not been made, but that he had submitted a confidential recommendation on the subject to the Department of Justice for consideration. *Id.* at 8. He could not comment on the substance of that recommendation or when a final decision would be made. *Id.* Alert to the notice requirements imposed by 18 U.S.C. § 3161, the Court implored Mr. Haynie to see to it that a decision was made in short order and emphasized that under no circumstances would the Court allow defense counsel to be surprised by the filing of a Death Notice. *Id.* at 8–9. Mr. Haynie understood the Court's concern and stated that he believed that the Department of Justice's death penalty review process depended, logically, on the volume of cases before the review committee and the cases' scheduled trial dates. *Id.* at 9.

Based on that information, the Court expressed to the parties its hesitance to change the trial date at that juncture because doing so might postpone the Government's decision whether to seek the death penalty. *Id.* at 10, 14–15. Indeed, Mr. Dash, who also hoped the Government would make a decision sooner rather than later, explicitly agreed that maintaining the December 13, 2004 trial date might speed the Department of Justice's death penalty review process. *Id.* at 14. Therefore, despite his request for a continuance, Mr. Dash did not object to keeping the December 13, 2004 trial date intact at that point in time.

Accordingly, in an Order entered the day after the status conference, October 28, 2004, the Court commanded the Government to make a final decision regarding the death penalty by November 22, 2004, directed the parties to appear for another status conference that same day, and memorialized the parties' representations at the status conference as follows:

1. Counsel for Defendant confirmed and reiterated that Defendant Ponder waived his rights under the Speedy Trial Act, 18 U.S.C. § 3161, at a preliminary hearing before United States Magistrate Judge F. Bradford Stillman on August 4, 2004 as the defense needed more time to prepare for trial.

2. Defense counsel reported that no pretrial motions were filed because the Government [had] yet to produce requested discovery materials, in particular the results of analyses of alleged DNA evidence the Government may attempt to introduce at trial. Defense counsel, however, acknowledged that the reason for the delay had to do with the time and difficulty involved in collecting and analyzing DNA evidence, and

not due to bad faith on the part of the Government.

3. Attorneys for the Government represented that analysts with the Department of the Army responsible for analyzing the DNA evidence promised to complete their work by November 22, 2004. The Government pledged to turn over the DNA evidence to Defendant upon receiving it and represented that it would not object to pretrial motions filed late by Defendant as a result.

4. Based on newly discovered evidence, counsel for the Government informed the Court that it may [request] that [a] superseding indictment be issued against Defendant.

5. Attorneys for the Government informed the Court that a decision had not been reached on whether to seek the death penalty in this case. Assistant United States Attorney Haynie informed the Court that a recommendation has been submitted to the Department of Justice and that a decision will be reached as soon as is practicable.

6. Both parties informed the Court that, due to the slow pace of discovery, and in particular due to the need for Defendant's attorneys to review the evidence the Government will rely upon in its case-in-chief so that they can prepare a defense, they may, at some point in the future, move the Court to postpone the trial date set for December 13, 2004.

Order, Doc. No. 19 (Oct. 28, 2004).

In sum, upon completion of the status conference, and as implied in this Court's October 28, 2004 Order, there was no question that beginning trial on December 13, 2004 was simply not possible due to the justifiably slow pace of the parties' respective investigations and the status of discovery. The only reason that the trial date was not continued at the status conference was to keep the Department of Justice's death penalty review process on track. The entire purpose of ordering a follow-up status conference on November 22, 2004 was to revisit the status of inspection and discovery and to discuss a feasible trial schedule. The events of the October 27, 2004 status conference and its effect on the procedural posture of the case are addressed in further detail in the Court's analysis below.

## C. Subsequent Procedural History

On November 4, 2004, as the Government indicated might happen at the October 27, 2004 status conference, a superseding indictment was issued adding a count of felony murder in violation of 18 U.S.C. § 1111 against the Defendant. The parties agreed that the Defendant would be arraigned on the superseding indictment by this Court at the November 22, 2004 status conference. Two weeks later, on November 18, 2004, the Government filed a Notice of Intent to Seek the Death Penalty, setting forth the statutory and nonstatutory aggravating factors that, if proven, it alleged would warrant imposition of the death penalty. A day after filing the Death Notice, the Government also turned over a summary of its findings regarding the DNA evidence to defense counsel and further informed them that a formal report was expected by the end of the month. *See* Def.'s Mot. to Strike at Attach. A, Doc. No. 22. On November 22, 2004, the Defendant filed its Motion to Strike the Notice of Intent to Seek the Death Penalty, alleging that it was untimely filed. *See* Def.'s Mot. to Strike, Doc No. 22.

The Court-ordered status conference set for November 22, 2004 was conducted as

planned. The first order of business was to arraign the Defendant on the superseding indictment. The Defendant pled not guilty to all five counts and asserted his rights under the Speedy Trial Act. 18 U.S.C. § 3161. The Court completed the arraignment and turned to the pending Motion.

At that point, defense counsel noticed the appearance of a third attorney, Richmond Assistant Federal Public Defender Gerald T. Zerkin, who prepared the instant Motion and, at the Court's pleasure, was prepared to argue the merits. All parties agreed that, due to the importance of the issue and its implications for the status of the case, the Motion should be resolved as soon as possible. Without objection, the Court therefore scheduled a merits hearing for the next day, November 23, 2004. Due to the expedited schedule, rather than require an opposition brief, the Court ordered the Government to provide to defense counsel and the Court a list of cases on which it would rely in oral argument via facsimile by the close of business on November 22, 2004, which it did. The merits hearing was conducted on November 23, 2004 and the Motion is now ripe for resolution. Before concluding the merits hearing, as indicated at the October 27, 2004 status conference, and for reasons independent of the filing of the Death Notice, the Court continued the trial date until May 31, 2005.

## II. STANDARD OF REVIEW

In criminal prosecutions where the offense charged is punishable by death, the Federal Death Penalty Act requires the Government to provide notice of its intent to seek the death penalty a reasonable time before trial.

> [I]f . . . the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified . . ., the attorney shall, *a reasonable time before the trial or before acceptance by the court of a plea of guilty*, sign and file with the court, and serve on the defendant, a notice -
>
> (1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified . . . and that the government will seek the sentence of death; and
>
> (2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

18 U.S.C. § 3593(a) (emphasis added). The question presented by the instant Motion is whether the Government's Death Notice was filed a "reasonable time before trial."

Section 3593 does not specify what constitutes "a reasonable time before trial." In *United States v. Ferebe*, 332 F.3d 722 (4th Cir.2003), the United States Court of Appeals for the Fourth Circuit established an analytic framework by which to evaluate the reasonableness of the timing of a Death Notice. As one district court explained, however, rather than provide precise guidance on the contours of § 3593, *Ferebe* "provides an elucidation, or more precisely, an elaboration of the statute." *United States v. Le*, 311 F.Supp.2d 527, 531 (E.D.Va.2004).

According to the divided panel in *Ferebe*, § 3593 is "a prophylactic statute, one of the chief aims of which is to protect the accused from having to endure a trial for his life for which he was not on reasonable notice, [which requires] inquiry into the *objective reasonableness* of the time between issuance of the Death Notice and the trial itself, *in light of the particulars of the charged offense and the anticipated*

*nature of the defense."* 332 F.3d at 727 (emphasis added). Therefore, courts must conduct "a pretrial inquiry into the objective reasonableness of the notice provided." *Id.* at 731. A Death Notice filed an objectively unreasonable period of time prior to trial, such that it violates a defendant's right not to face trial for his life without adequate notice, must be stricken.

To ascertain whether the time between the issuance of the Death Notice and the trial is objectively reasonable, *Ferebe* directs courts to consider,

> among other factors that may appear relevant, (1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and, in addition, (4) the status of discovery in the proceedings. It should be determined on the basis of these factors whether sufficient time exists following notice and before trial for a defendant to prepare his death defense.

*Id.* at 737. This is a "non-exhaustive list of factors" for courts to consider, *United States v. Breeden,* 366 F.3d 369, 374 (4th Cir.2004), and no single factor is dispositive.

■ At all times throughout the analysis, to ensure the prophylactic feature of § 3593, courts apparently must refrain altogether from evaluating whether the timing of the Death Notice actually, or might at some point in the future, prejudice the defendant. *See id.* at 732 (indicating that a defendant's rights are violated *"regardless of whether he will or will not be, or was or was not, prejudiced by an unreasonably delayed Death Notice"*) (emphasis in original), 736 ("[T]he question of whether the statute has been violated by a prejudice inquiry is, pure and simple, to confuse

the question of harmlessness with the question of violation."); *see also Le,* 311 F.Supp.2d at 532 ("Actual prejudice is not a factor."); *United States v. Hatten,* 276 F.Supp.2d 574, 579 n. 4 (S.D.W.Va.2003) (*"Ferebe* is clear that prejudice to the defense is not a factor."). Thus, according to *Ferebe* and the district court cases interpreting it, scrutinizing the objective reasonableness of the timing of the Death Notice is an endeavor separate and apart from contemplating any prejudice that may have been, or may at some point in the future be, caused to the defendant.

With the *Ferebe* analytical framework as our guide, we turn now to a factor-by-factor consideration of the merits of the instant Motion.

## III. ANALYSIS

### A. The First *Ferebe* Factor: Nature of the Charges in the Indictment

#### 1. Analytic Approach

■ The first *Ferebe* factor requires courts to consider the "nature of the charges presented in the indictment." 332 F.3d at 737. It is not altogether clear how this factor should be weighed or in which direction observations regarding this factor should cut. The *Ferebe* decision provides little guidance in and of itself, and the cases applying the *Ferebe* framework take different approaches. For instance, in *Le,* 311 F.Supp.2d at 534, and *U.S.* v. *Breeden,* 2003 WL 22019060, *3 (W.D.Va. Aug. 22, 2003), *affirmed,* 366 F.3d 369 (4th Cir.2004), the district courts considered this factor in light of the time between the filing of the Death Notice and the scheduled trial date to determine whether the defendant would have adequate time to prepare a defense. The district court in *Hatten,* 276 F.Supp.2d at 578, on the other hand, considered whether the timing of the Death Notice was reasonable from the per-

spective of the Government given the nature of the charges in the indictment. *Hatten* set aside the question of the reasonableness of the timing from the Defendant's perspective until it considered the third *Ferebe* factor, which evaluates the period of time remaining between the filing of the Death Notice and the start of trial. In other words, the *Hatten* court examined whether the Government should have filed the Death Notice earlier than it did given the nature of the charges in the indictment and the status of the discovery and inspection process. The *Hatten* approach is more appropriate, particularly given the facts of the present case, because it ensures that the first *Ferebe* factor is addressed independently and is not subsumed by the third factor.

## 2. Analysis

The charges against Defendant Ponder are not extraordinary in any respect: the elements, proof required, and applicable law are straightforward. However, observing the charges through the lens of the type of evidence involved and the expanse of the Government's investigation sheds some light on the objective reasonableness of the timing of the Death Notice.

At the October 27, 2004 status conference, Assistant United States Attorney Haynie informed the Court of two evidentiary challenges delaying the Government's investigation. First, the Government had *obtained DNA evidence from Virginia and Arizona*, where the murder is alleged to have taken place and where the Defendant was apprehended, respectively. The DNA evidence from the two states was stored together and was not shipped to the Government's examiners until it was ready in its entirety for analysis. Thus, due to both the volume of DNA evidence and the time involved in collecting it, as of the October 27, 2004 status conference, the Government's analysis was only three-quarters complete. *See* Tr. at 5–6, Doc. No. ___ (Oct. 27, 2004).

Second, due to the Defendant's alleged flight from Virginia to Arizona, the Government's investigation was time-consuming and resulted in a lengthy investigation. Specifically, according to Mr. Haynie:

> The other discovery problem is that we've had evidence, as the Court may or may not know, in his flight, the defendant passed through every, pretty much every state from here to Florida and from Florida to Nevada and Arizona, making stops along the way. We have had to comb, the FBI has had to go out to each stop and pick up evidence of credit card usage and closed-circuit television and surveillance video and witnesses that may or may not have seen the defendant in his flight and any statements he's made.
>
> So that evidence has come in rather piecemeal.

*Id.* at 6.

The combined result of these two evidentiary challenges is that, as of October 27, 2004, the Government had not completed its investigation and was not fully aware of the scope of the alleged offenses. Indeed, the Government informed the Court that it anticipated filing a superseding indictment based on newly discovered evidence, *id.* at 8, which it did on November 4, 2004. It was only two weeks after the filing of the superseding indictment, on November 18, 2004, that the Government filed its Death Notice. At the November 23, 2004 merits hearing concerning the instant Motion, Mr. Haynie informed the Court that the decision to seek the death penalty was in part due to the results of the DNA testing, which was completed only days before, and in part due to newly discovered evidence. Tr. at 17–18, Doc. No. ___ (Nov. 23, 2004). The Court cred-

its this representation because it is consistent with the Government's report of the status of its investigation at the October 27, 2004 hearing, which the Defendant did not contest.

The nature of the charges and evidence in this case contrasts with that in *Hatten,* where a district court's analysis on this factor weighed in favor of the defendant because the Government had completed its investigation "and chose to defer the [Death] Notice until" much later. 276 F.Supp.2d at 578. Of critical import to the *Hatten* court was the fact that the Government "took more than three months after the Superseding Indictment to provide the formal Death Notice." *Id.* at 578–79. Here, there was no delay between the completion of the Government's investigation and analysis, the filing of the superseding indictment, and the decision to seek the death penalty. To the contrary, the Death Notice was filed on the heels of the superseding indictment and was based at least in part on newly discovered evidence and the Government's examination of the preliminary DNA results. Couple that with the fact that the Government kept the Defendant and Court fully abreast of the status of its investigation and pledged not to object to a continuance and extension of the motions deadline so that the Defendant could file motions after receiving discovery, *see* Tr. at 6, Doc. No. ___ (Oct. 27, 2004), and it is clear that the Government, rather than rush and file a Death Notice before ascertaining whether the death penalty was warranted, withheld judgment until it was equipped with all the information necessary to make a fully informed decision. In short, the Government acted reasonably; to be more precise, the Government not only acted reasonably, but also solicitously towards the rights of the Defendant by delaying the decision to seek the death penalty until the completion of its discovery and inspection process.

The Defendant's memorandum in support of the instant Motion does not address this factor or the circumstances surrounding the timing of the Death Notice from the Government's perspective. However, the Defendant would most likely counter that, using reasoning akin to that employed by the district courts in *Le* and *Breeden,* the nature of the charges in the indictment make it impossible to mount a defense given the filing of the Death Notice on November 18, 2004, when the trial date was set for December 13, 2004. That argument only holds water if the trial was actually going to begin on December 13, 2004, an issue properly reserved for consideration under the third *Ferebe* factor. Furthermore, the severity of the potential punishment for capital murder and the implications this case presents for the Defendant's liberty have been translucent since the outset, which is why, for example, the Office of the Federal Public Defender requested, and this Court granted, the appointment of additional counsel experienced in defending capital cases. The Defendant has known all along that the death penalty was a possibility and has conducted itself accordingly. That does not mean that any notice at all is reasonable; but it does mean that the nature of the charges in the present indictment, charges which have been death-eligible all along, do not support the Defendant's position. Thus, the first *Ferebe* factor weighs in favor of the Government.

### B. The Second *Ferebe* Factor: Nature of the Aggravating Factors

#### 1. Analytic Approach

 The second *Ferebe* factor for courts to consider is "the nature of the aggravating factors provided in the Death Notice." 332 F.3d at 737. The same confusion described above about how to approach the

first *Ferebe* factor exists with regard to how to evaluate this one. For the same reasons discussed above, this Court adopts an approach identical to that employed in *Hatten*, which considers the reasonableness of the timing according to whether the nature of the aggravating factors indicate that the Government should have filed the Death Notice earlier.

## 2. Analysis

Among the aggravating factors listed in the Death Notice are the depraved manner of killing, pecuniary gain, substantial planning and premeditation, future dangerousness, and lack of remorse. *See* Notice of Intent to Seek the Death Penalty, Doc. No. 21. All of the factors are legally and factually straightforward. However, according to Mr. Haynie, some of the evidence concerning aggravating factors is newly discovered. Tr. at 18, Doc No. ___ (Nov. 23, 2004). In particular, the Government has obtained evidence regarding the aggravating factors from jailhouse informants, which must have been collected since the Defendant's incarceration on the present charges. *Id.* Furthermore, though the Court is not equipped to make a formal finding in this regard, it appears reasonable to presume that information regarding the aggravating factor of pecuniary gain, for instance, probably came to light over time due to the Government's cross-country investigation. Put differently, there is nothing about the nature of the aggravating factors to indicate that the Government should have acted sooner to file the Death Notice or to suggest that Mr. Haynie's representations regarding the length and scope of the investigation are not true.

Again, these facts contrast with those in *Hatten*, where a district court found that the second *Ferebe* factor favored the defendant because the aggravating factors were "well known to the Government for months before the Death Notice" was filed. 276 F.Supp.2d at 578. According to the Government's representations, to which the Defendant has not objected and which the Court credits as true, that is not the case here. The Government's decision that aggravating factors warranted seeking the death penalty was only possible upon receiving the preliminary DNA evidence and uncovering some new evidence. *See* Tr. at 18, Doc. No. ___ (Nov. 23, 2004). This weighs in favor of the reasonableness of the timing of the Death Notice.

In its memorandum in support of the instant Motion, the Defendant argues that there is insufficient time to prepare a defense to these aggravating factors. Specifically, he argues that some of the aggravating factors are subject to pre-trial attack that cannot be completed prior to the scheduled December 13, 2004 trial date. This argument again presumes that the trial was actually going to begin on December 13, 2004, an issue properly reserved for the third *Ferebe* factor, to which we now turn.

## C. The Third *Ferebe* Factor: Time Between the Death Notice and Trial

### 1. Analytic Approach

The third *Ferebe* factor for courts to consider is "the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects." 332 F.3d at 737. The Fourth Circuit does provide limited guidance on how to weigh this factor, instructing courts to make "reference to *two* dates: the first, obviously, being the date the Death Notice is filed, and the second, obviously, being the trial date." *Id.* at 737 n. 6 (emphasis in original). It goes without saying that the first date in this case is November 18, 2004—the date

that the Death Notice was filed. The question in dispute among the parties is whether the December 13, 2004 trial date should serve as the outer limit for consideration or, instead, whether the Court may consider a later date based on the fact that the December 13, 2004 trial date was going to be continued.

The Defendant, obviously, urges the Court to consider as the relevant interval November 18, 2004 to December 13, 2004. If this interval is considered, the time between the filing of the Death Notice and the trial date is 25 days, which the Defendant contends is inadequate to prepare a death penalty defense, especially in light of the fact that the Speedy Trial Act, 18 U.S.C. § 3161, guarantees defendants at least 30 days after the issuance of an indictment to prepare for trial. The Defendant maintains that, because *Ferebe* requires courts to conduct a pre-trial review as to the reasonableness of the timing of the Death Notice, the Court cannot look beyond the December 13, 2004 trial date because that is the one that was established. *See Le*, 311 F.Supp.2d at 532 ("For purposes of pretrial challenges, the scheduled trial date constitutes the trial date in this analysis."); *Hatten*, 276 F.Supp.2d at 579 ("[T]he court must look at the trial date that was in existence at the time of such filing."). Since the December 13, 2004 date had not been continued, urges the Defendant, that date must control.

This, however, ignores *Ferebe's* admonishment that a defendant's right not to stand trial absent adequate notice of the Government's intent to seek the death penalty is impinged "at the point when he proceeds toward trial, *or actually to trial,* in the absence of a reasonable time between his receipt of the Death Notice and his capital trial." *Id.* at 732 (emphasis added). Courts are not restricted to merely counting days between a Death

Notice and the scheduled trial date if the court knows, and the parties are reasonably aware, that the matter is not actually proceeding to trial on that date. Indeed, in *Ferebe* itself there was a set trial date that, under the Defendant's argument, would establish the outer bound of the time interval. In spite of that, and detrimental to the Defendant's argument here, the Fourth Circuit remanded the case because the district court's own words "cast doubt on whether that date in fact remained fixed." *Id.* at 738. On remand, the Fourth Circuit allowed for the possibility that other procedural issues in the *Ferebe* case that had the *"practical.* effect of canceling the ... trial date" could be considered in determining the reasonableness of the timing of the Death Notice. *Id.* (emphasis in original).

Of course, while the Court may consider whether or not this matter was actually going to go to trial on December 13, 2004, the Fourth Circuit has made abundantly clear that the reasonableness of the timing of the Death Notice must be measured irrespective of the Death Notice's effects on the procedural posture of the case. *Id.* at 737. Thus, if a trial date is continued because the filing of the Death Notice is too close to the trial date, the Death Notice is per se unreasonable. "Put another way, an untimely Death Notice cannot be rescued by delaying the trial date." *Le*, 311 F.Supp.2d at 532; *see also Hatten*, 276 F.Supp.2d at 579 n. 4 ("[D]elaying the trial date is not a remedy for an untimely Death Notice."); *Breeden*. 2003 WL 22019060 at *2 ("[A] court cannot continue a case for the purpose of allowing the government to file a timely Death Notice."). Accordingly, the question this Court must resolve with respect to the third *Ferebe* factor is two-fold: first, whether this case was actually going to trial on December 13, 2004 and, if not, whether the reason it was not going to

trial on December 13, 2004 had to do with the filing of the Death Notice or some other reason.

### 2. Analysis: The October 27, 2004 Status Conference

As described in the procedural history recited above, upon completion of the October 27, 2004 status conference, there was no question that this matter was not going to trial on December 13, 2004 due to the justifiably slow pace of the discovery and inspection process. The only reason the Court did not continue the trial date at the October 27, 2004 status conference was to hold the Government's feet to the fire on deciding whether to seek the death penalty. Indeed, these two issues-the slow pace of discovery and whether the Government might seek the death penalty-were the impetuses for holding the status conference in the first place.

The most convincing evidence that the slow pace of discovery had the practical effect of rendering the December 13, 2004 trial date untenable, independent of whether the Government decided to seek the death penalty, came from Federal Public Defender Dash:

> I know that there are no pretrial motions submitted yet. And part of the problem is—and I'm not necessarily, you know, trying to cast blame on anybody, but there is a fair amount of discovery that we just haven't gotten yet. We have received limited discovery at this point in time. In particular the problem that we have is, our understanding is there's a lot of items that are at the laboratory, at serology and the DNA laboratory, and that work is not completed yet. Now, Mr. Haynie informed us today that it looked like it might not be done until towards the end of November.

> *Realistically, Judge, I think that there is not a chance that we could review that, possibly file any motions at that point in time, if there are any that are appropriate, and still be ready for trial by the December date that is currently set.*

> We've talked to our client about it. He understands the need for us to do a thorough investigation to review evidence and have, possibly, our own independent expert review serology and DNA evidence, and the probability that he's not going to go to trial in December, and we're going to be respectfully requesting a further continuance. *And that's kind of what we were doing when you came walking in, was kind of looking at our calendars to see when dates might be available.*

Tr. at 4–5, Doc. No. ___ (Oct. 27, 2004) (emphasis added). He further added, in reference to discussions with the prosecution, that, "[w]ell, Judge, we've talked, and I just, you know, *we all agree* that there's just no way that we're going to be able to go to trial in December." *Id.* at 5 (emphasis added). In addition to the time involved in analyzing the DNA evidence, Mr. Dash represented that counsel for the defense was "still pursuing some of those aspects in trying to track down potential leads from here to Germany." *Id.* at 11. Finally, he later stated, "I think that realistically, if we were to look at trial dates potentially in late March, April, sometime like that." *Id.* at 13.

Assistant United States Attorney Haynie, for his part, assured Mr. Dash and the Court that, since the DNA findings would not be available until the end of November, "[w]ith regard to filing motions, we, . . . would have no objections to late filing of motions due to the late turning over of discovery. And I certainly understand their request for a continuance. . . ." *Id.* at

6–7. In short, the Government concurred that a continuance was necessary.

After discussing the difficulty of collecting and examining the evidence involved in this case due to the alleged flight of Defendant Ponder across the country, the fact that he lived overseas for many years, and the time involved in conducting DNA tests, *see id.* at 4–8, 10–12, no one involved in the October 27, 2004 status conference believed that this trial would begin in December. The Court, though noting that April seemed a bit too far off, made clear that a December trial date, due to the time of year and the evidence involved, was not realistic. *See id.* at 13 ("You know, I realize December gets to be—especially after the first week or two, it gets to be a dead month. It's dead. Right on up till about the first week in January before things start returning to normal."), 14 ("I realize how much time DNA analysis takes."), 14 ("Why don't we plan on getting back here in about three weeks and let's see where we are. Then you can make a determination, Mr. Dash or Mr. Broccoletti, if you desire a continuance.").

Despite the agreement on the need for a continuance, the Court was hesitant to change the trial date at that time for fear that it might stall the Government's decisionmaking process on whether to seek the death penalty, which might in turn unnecessarily slow down the case. *Id.* at 10, 14–15. Upon inquiry about when a. decision might be made, Mr. Haynie was unable to give the Court a firm answer. *Id.* at 8–9. This prompted a warning from the Court to the Government: "Well, if you want me to, I'll set a trial date next week and maybe [the Department of Justice] will review it promptly, huh? I'll be happy to do that, Mr. Haynie. If they're looking at trial dates, I'll give them a trial date." *Id.* at 9. In fact, Mr. Dash himself recommended maintaining the December 13,

2004 trial date because he also wanted to force the Government's hand, prompting the following colloquy:

> MR. DASH: And Judge, the other thing, I guess if we leave the date as it is today, on December 13th, hopefully it will force the Department of Justice, the Attorney General, to act on [the death penalty decision] prior to that time so that -."

> THE COURT: Well, I think that would be a good idea. I don't want to extend the date *yet.* In fact, I might want to shorten the date to see if we can't get them to make some decision.

*Id.* at 14–15 (emphasis added).

Reviewing the October 27, 2004 transcript makes clear that there was no question that, regardless of whether the Government ultimately decided to seek the death penalty, a continuance would be granted so that *both parties* would have adequate time to prepare for trial, and in particular so that the defense would have ample time to prepare. At the merits hearing on the instant Motion, however, defense counsel changed its position on its preparedness for trial, informing the Court that it was ready to proceed in a non-death penalty murder trial on December 13, 2004. Tr. at 30, 35–38, Doc. No. ____ (Nov. 23, 2004). Given Mr. Dash's representations at the October 27, 2004 status conference, it is impossible that, just three weeks later, the defense is now prepared to go forward on December 13, 2004. The Court *finds as a matter of fact* that defense counsel, as of the November 23, 2004 merits hearing on the instant motion, was not prepared to go to trial on December 13, 2004. Rather, defense counsel changed its position only after filing the instant Motion in a backhanded attempt to render the Death Notice untimely, a tactic the Court will not condone.

### 3. Analysis: The Reasonableness of the Time Interval

Indisputably, December 13, 2004 was not the actual trial date. The discourse at the October 27, 2004 status conference, the nature of the evidence involved in this case, and the slow pace of discovery all had the practical effect of canceling the scheduled trial date. This leaves open the question of what outer limit to use in evaluating the time interval. One possibility is May 31, 2005, the trial date established at the November 23, 2004 merits hearing on the present Motion, which was set for reasons independent of the date the Death Notice was filed. *Id.* at 41–2, 45. Another possibility is selecting a date in March or April, per Mr. Dash's statement at the October 27, 2004 status conference that scheduling a trial date in that vicinity would be appropriate. Tr. at 13, Doc. No. ___ (Oct. 27, 2004). Ultimately, however, the Court need not engage in guesswork just for the purpose of satisfying the *Ferebe* analytical framework. Despite the Defendant's protestations to the contrary, *Ferebe* imposes no such formalistic requirement.

Even if the Court ultimately scheduled the trial for a date in advance of March, April, or May, given that the trial was certainly not going to go forward on December 13, 2004, and given that the Court ensured the parties at the October 27, 2004 status conference that there would be adequate time for discovery, the time interval between the filing of the notice and the trial date would necessarily have been reasonable. Furthermore, and more importantly, at the October 27, 2004 status conference the Court took the additional step of ordering the Government to make a decision regarding the death penalty no later than November 22, 2004. *See* Tr. at 15, Doc. No. ___ (Oct. 27, 2004); *see also* Order, Doc. No. 19 (Oct. 28, 2004). Defense counsel did not object to this date, which had the practical effect of ratifying the reasonableness of the deadline imposed. Since the Government filed the Death Notice in advance of the Court-imposed deadline, it is, for all intents and purposes, per se reasonable. Consequently, the third *Ferebe* factor weighs in favor of the Government.

### D. The Fourth *Ferebe* Factor: The Status of Discovery

■ *Ferebe* also directs courts to consider "the status of discovery in the proceedings." 332 F.3d at 737. As discussed above, discovery in this case had barely even started at the time of the October 27, 2004 status conference. Little has changed since then. Though the Government has shared the preliminary results of its DNA analysis with the Defendant, a final report is not due out until the end of the month. *See* Def.'s Mot. to Strike at Attach. A, Doc. No. 22. The Defendant contends that this weighs his favor because an adequate defense to a death penalty case could not possibly be prepared between November 18, 2004 and December 13, 2004. However, as explained, the trial was not going to go forward by December 13, 2004. The dearth of discovery only serves as confirmation of that reality. Accordingly, the fourth *Ferebe* factor supports the reasonableness of the timing of the Death Notice.

### E. Other Relevant Factors

Finally, *Ferebe* also implores courts to consider "other factors that may appear relevant." 332 F.3d at 737. A factor relevant to the objective reasonableness of the timing in this case that does not fit neatly within the aforementioned four factors is the procedural safeguards imposed by this Court to protect the Defendant's rights.

The Fourth Circuit's concern in *Ferebe* was that a defendant's right not to stand

trial for his life without reasonable notice be preserved. That is precisely what happened in this case. Fully aware of the requirements of § 3593 and mindful of the necessity of ensuring that each stage of a capital murder trial is conducted with abundant care due to the severity of the crime charged and the grave punishment for which a defendant is eligible, this Court, *on its own initiative, without any prompting from either party,* ordered a status conference to monitor the progress of discovery and inspection, inquire as to the penalty sought, and consider the feasibility of the established trial date. The Court did this with an eye towards protecting the rights of the Defendant and safeguarding the integrity of our criminal justice system. To be certain, that is exactly why the Court not only held the October 27, 2004 status conference in the first place, but also ordered the Government to reach a decision on whether it intended to seek the death penalty by a specific date (an order to which defense counsel not only did not object, but agreed was a good idea). *See* Tr. at 14–15, Doc. No. ___ (Oct. 27, 2004). As the Court explained in the October 28, 2004 Order:

> Death is the most severe punishment available under law: once imposed, it cannot be undone. It is for that reason that "[w]hen a defendant's life is at stake, the Court [must be] particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, J.). Indeed, elemental precepts of justice demand that the Court-and all parties involved-be especially solicitous at every stage in a case where the death penalty may be imposed.

Order, Doc. No. 19 (Oct. 28, 2004).

An analytical framework focused too narrowly on the date of the Death Notice in relation to the scheduled trial date, as urged by the Defendant, would have the ironic effect of disincentivizing the sort of rigorous case management utilized by this Court to protect the especially sensitive liberty interest at stake in a capital case. If the death penalty is to be sought, the sooner everyone knows, the better. That is the policy underlying § 3593 and the impetus for the Court's decision to hold the Government's feet to the fire. In effect, had the Court officially cancelled the trial date, regardless of whether a new one was even set, under the position urged by the Defendant, the Death Notice would have been reasonable—even though the Defendant would have likely received the Death Notice at a later date. It is hard to see how that result would protect the Defendant's rights anymore than the Court-imposed safeguards employed here. In fact, it would not. The Court's use of these safeguards is another factor supporting the reasonableness of the timing of the Death Notice.

## IV. CONCLUSION AND ORDER

 This case illustrates the critical importance of scrutinizing the entire context surrounding the filing of the Death Notice. Due to the prophylactic nature of § 3593 and the prohibition on considering prejudice to the Defendant, there may be a tendency to treat the time interval between the filing of the Death Notice as dispositive in and of itself, without considering how the other *Ferebe* factors, including other relevant factors, combine to shed light on whether the right of a defendant not to stand trial for his life without adequate notice has been safeguarded. While the time interval is a factor to be considered, divorcing it from consideration of a case's context would set up a sinkhole that would swallow the broader analytic frame-

work established by *Ferebe*.[2]

With that in mind, taking into account all of the factors discussed above, it is evident that the time between the issuance of the Death Notice by the Government and the trial itself was objectively reasonable. This is especially the case in light of the particulars of the charged offense and alleged aggravating factors, which only came to light upon completion of the Government's expansive investigation and time-consuming analysis of DNA. Consequently, the Government could not possibly have filed the Death Notice any sooner than it did. Furthermore, the justifiably slow pace of discovery and inspection, coupled with the explicit representations of the parties at the October 27, 2004 status conference, make transparent the fact that this matter was not headed to trial on December 13, 2004. Finally, the procedural safeguards imposed by this Court to protect the sensitive liberty interest at stake, including a status conference ordered *sua sponte* and the setting of a deadline for filing of the Death Notice, which the Defendant urged and did not object to, also supports the objective reasonableness of the timing.

The Defendant's right to not to stand trial for his life without reasonable notice of the Government's intent to seek the death penalty has been preserved. Accordingly, the Defendant's Motion to Strike the Notice of Intent to Seek the Death Penalty is **DENIED**.

The Defendant is **ADVISED** that, in accordance with the United States Court of Appeals holding in *United States v. Ferebe*, 332 F.3d 722, 726 (4th Cir.2003), a district court's order denying a motion to strike a Death Notice as untimely filed is immediately appealable as a final decision under 28 U.S.C. § 1291. To effectuate an appeal from this Memorandum Opinion and Order, the Defendant must forward a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia 23510. The written notice must be received by the Clerk within ten (10) days from the date of this Memorandum Opinion and Order. *See* Fed. R.App. P. 3 and 4.

The Clerk of the Court is **DIRECTED** to send a copy of this order to all counsel of record in this case via facsimile and United States mail.

**IT IS SO ORDERED.**

---

2. Divorcing the time interval from the broader context of the case causes other difficulties in trial management as well. For instance, placing undue weight on the time interval causes tension between 18 U.S.C. § 3593 and the Speedy Trial Act. 18 U.S.C. § 3161. Some courts might choose not to set a trial date in order to ensure that a Death Notice is filed a reasonable time before trial. However, this implicates a defendant's speedy trial rights. Conversely, invoking speedy trial rights to expedite the establishment of a trial date might have the effect of nullifying any Death Notice, a result that could not be intended by § 3593. Or, a defendant who invokes his speedy trial rights might provoke the Government to file a Death Notice prior to a thorough investigation simply to preserve its right to seek it. Such problems might be resolved by further guidance from the United States Court of Appeals on how to manipulate the *Ferebe* factors.